[Crim. No. 6205.   First Dist., Div. One.   June 17, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. PATRICK ELMER COX, Defendant and Appellant.

James J. Brosnahan, under appointment by the Court of Appeal, and Cooper, White & Cooper for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Robert R. Granucci and George R. Nock, Deputy Attorneys General, for Plaintiff and Respondent.

SIMS, J.—Defendant, personally, and his trial counsel, on his behalf, have each filed a notice of appeal from a judgment of conviction sentencing defendant to state prison following a jury verdict that found him guilty of a conspiracy (Pen. Code, § 182, subd. 1) to manufacture without a permit and possess amphetamine, a dangerous drug (Bus. & Prof. Code, § 4211, subd. (c)) in violation of sections 4084 and 4230 of the Business and Professions Code and section 26281 of the Health and Safety Code.

The evidence upon which defendant was convicted was obtained by the execution of a search warrant. Defendant contends that the magistrate erred in denying his motion to suppress the evidence so seized, and that the trial court erred in admitting it against him at the trial, because the search warrant was invalid. This assertion is predicated upon the ground that the observations related in the affidavit upon which the search warrant was based were made as the result

of an illegal entry into premises leased by defendant. Defendant urges that the original entry was illegal (1) because the service of an outstanding warrant for the arrest of defendant was delayed and used as a subterfuge to justify the original entry into the premises, and (2) because in any event the original entry in the course of attempting to execute the warrant of arrest was not properly effected. These contentions have been examined and found to be without merit. The judgment must be affirmed.

*General Statement of Facts*

Defendant first moved to quash the search warrant before the magistrate. The magistrate found the affidavit filed in support of the search warrant sufficient on its face, but conducted an extensive hearing to determine whether the information in the affidavit was obtained as a result of a prior illegal entry and search. At the conclusion of that hearing the court denied the motion to quash the search warrant. At the trial, in response to defendant's objection, a further hearing was held, out of the presence of the jury, to determine the validity of the search warrant and the admissibility of the evidence secured when it was executed. The record of the hearing before the magistrate was introduced in evidence, and further testimony was taken. The trial court likewise overruled defendant's objections.

The evidence adduced shows that prior to March 7, 1966, when defendant appeared in court in Santa Rosa on charges not related to the instant offense, both the Sonoma County sheriff's office and the police department of the City of Santa Rosa had been apprised of an outstanding warrant for defendant's arrest on a charge pending in San Mateo County of automobile embezzlement in violation of section 10851 of the Vehicle Code, and that each law enforcement agency had previously attempted to serve the warrant. Defendant claims that the failure to serve the warrant on the occasion when he appeared in court was deliberate and colors and renders invalid the subsequent use of the warrant in connection with the entry to the premises he leased. The facts bearing on this question are discussed below in connection with the applicable legal principles.

On March 9, 1966, the chief of the police department was advised by another law enforcement agency that defendant could be found at premises at 2912 Spring Creek Drive in the city. An attempt to serve defendant at that address did not turn him up, but did result in the arrest of three occupants of

the premises. No attack is made upon the actions of the police officers in connection with these arrests. A young woman arrested on that occasion did unwittingly reveal a telephone number for defendant. This number was traced and revealed an address in the unincorporated area of the county.

On March 11, 1966, the sheriff's office received advice from the San Mateo County sheriff's office that defendant could be located through a post office box. Investigation led to the same address as had been independently uncovered by the police department. Officers from each of the agencies joined forces, and it is their activities in connection with their attempt to serve the warrant of arrest which are attacked by defendant and reviewed below.

On the basis of the observations made on March 11, 1966, and information received from the State Bureau of Narcotics Enforcement, as incorporated in an affidavit and supplemented by testimony given before the magistrate, a search warrant was issued. Pursuant to the search warrant, chemicals and other articles of tangible evidence were seized and used at the trial to establish that defendant was conspiring to manufacture and possess amphetamine.

*Failure to Serve the Warrant of Arrest*

Before analyzing the specific contention of defendant it may be noted that a search warrant cannot be justified upon the basis of information that was illegally acquired. (*People* v. *Carswell* (1959) 51 Cal.2d 602, 606-607 [308 P.2d 852] [cert. denied (1959) 361 U.S. 854 [4 L.Ed.2d 92, 80 S.Ct. 100]]; *People* v. *Roberts* (1956) 47 Cal.2d 374, 377 [303 P.2d 721].)

In the proceedings attacking the search warrant, the burden was on the prosecution to show that the original entry into the premises was lawful. (*People* v. *Carswell, supra,* at p. 607; *People* v. *Roberts, supra,* at p. 377.) Nevertheless, if there is conflicting evidence, or if conflicting inferences may be drawn from evidence which is not controverted, the findings of the trial court must be upheld, and this court cannot substitute its judgment to overturn the conclusions of the lower court. (*People* v. *Carrillo* (1966) 64 Cal.2d 387, 390-391 [50 Cal.Rptr. 185, 412 P.2d 377]; *People* v. *Ghimenti* (1965) 232 Cal.App.2d 76, 81 [42 Cal.Rptr. 504].)

Defendant relies upon the principle that the service of an arrest warrant cannot be used as a pretext for a search for evidence. In *McKnight* v. *United States* (1950) 183 F.2d 977 [87 App.D.C. 151], the court reversed a denial of a motion to suppress evidence that had been obtained in connection with

the arrest, under a warrant, of a defendant in certain premises when there had been ample opportunity to arrest him before. The court stated, "Neither policemen nor private citizens can justify breaking into a house, or other violence, by deliberately creating an alleged necessity for it." (183 F.2d at p. 978. See also *United States* v. *Lefkowitz* (1932) 285 U.S. 452, 467 [76 L.Ed. 877, 883-884, 52 S.Ct. 420, 82 A.L.R. 775]; *Go-Bart Co.* v. *United States* (1930) 282 U.S. 344, 356-358 [75 L.Ed. 374, 381-383, 51 S.Ct. 153]; and *United States* v. *Alberti* (D.N.Y. 1954) 120 F.Supp. 171, 173-174; but cf. *Harris* v. *United States* (1947) 331 U.S. 145, 153 [91 L.Ed. 1399, 1407, 67 S.Ct. 1098]; and *United States* v. *Costello* (2d Cir. 1967) 381 F.2d 698, 700.) The rule has been recognized in this state. ▉ In *People* v. *Ghimenti, supra,* 232 Cal.App. 2d 76, the court took cognizance of authorities "which hold that where the search and not the arrest was the real object of the officers in entering upon the premises, and the arrest was a pretext for or, at most, an incident of the search, the search cannot be held to be reasonable. (*People* v. *Haven,* 59 Cal.2d 713 [31 Cal.Rptr. 47, 381 P.2d 927]; *People* v. *Roberts,* 47 Cal.2d 374 [303 P.2d 721]; *Harris* v. *United States,* 331 U.S. 145 [91 L.Ed. 1399, 67 S.Ct. 1096].) ▉ Further, where the arrest is for one crime, a general exploratory search for evidence of other crimes may not be made. (*People* v. *Mills,* 148 Cal.App.2d 392, 399-402 [306 P.2d 1005].)" (232 Cal. App.2d at p. 81. See, in addition to cases cited, *People* v. *Egan* (1967) 250 Cal.App.2d 433, 437 [58 Cal.Rptr. 627]; and *People* v. *Wilson* (1956) 145 Cal.App.2d 1, 5 [301 P.2d 974].) In *Egan, supra,* the opinion states "Search founded upon probable cause must be incident to a lawful arrest. [Citations.]" (250 Cal.App.2d at p. 437.)

The facts in this case do not compel application of the foregoing principles. On January 19, 1966, the warrant for defendant's arrest for violation of section 10851 of the Vehicle Code was issued, apparently in San Mateo County. On the 21st, the Sonoma County sheriff's office received a teletype copy of the warrant. On February 25th a lieutenant in the sheriff's office went to court in an unsuccessful attempt to serve defendant, who was scheduled to, but did not, appear in court on another charge. Then a Sonoma County deputy district attorney advised the sheriff's office that defendant would be in court on March 7, 1966. Thereafter, the deputy district attorney advised the sheriff's office that defendant's attorney had represented that the charge for which the outstanding

warrant had been issued was going to be dismissed, and he instructed the sheriff's office not to serve the warrant. On March 11, 1966, however, the sheriff's office received a second teletype warrant with information that defendant could be located through a post office box at the Penngrove post office. A deputy sheriff investigated this lead and was advised that the box holder lived at 2147 Crane Canyon Road in Sonoma County under the name of James. The visit to and search of those premises, which is described below, ensued.

The police department acknowledgedly was investigating possible narcotic violations by defendant in February 1966. It also apparently had a copy of the warrant for defendant's arrest. In early February the chief of police went to 2912 Spring Creek Drive looking for defendant but did not find him. Officer Stephens and the chief of police knew that defendant would have to appear in court later, and the chief instructed an inspector to ascertain the date. The chief never received a report back from the inspector, and although the inspector was available as a witness he was not called by either side. It was the custom of the sheriff's office to notify the police department when persons in whom the department was interested were to appear in court.

From the foregoing it may be inferred that the sheriff's office withheld service of the arrest warrant on the defendant on the basis of what appeared to be well-founded instructions from the district attorney. Under these circumstances there was no occasion to notify the police department that the defendant would be in court on March 7th. It also may be concluded that the police department failed to ascertain when the defendant would be in court available for service of the warrant. Under these circumstances, there is not, as a matter of law, a studied attempt to avoid service of the warrant. The subsequent attempt to serve the defendant at the premises within the city and the ensuing entry of defendant's premises in the county, under color of the warrant, as discussed below, furnish some evidence in support of defendant's views, but do not compel a finding contrary to that implied from the rulings below. In fact it is clear that no search or seizure was attempted in connection with the abortive attempt to serve the warrant of arrest at the county premises. The officers returned and obtained a search warrant.

*Entry of Defendant's Premises*

On March 9, 1966, the chief of police, Lieutenant Stephens, and two other officers had received information through offi-

cial channels that the defendant was still wanted and could be located at the premises at 2912 Spring Creek Drive, and they went there with the warrant for defendant's arrest. The officers knocked at the door, which was opened by a young man, and asked if Michele Miller was there, to which the boy responded that she was in the bedroom. The chief went to the bedroom door, which was ajar, and said, ''We are looking for Patrick Cox [defendant],'' to which Miss Miller responded, ''Go ahead and look.'' In the room the chief found Miss Miller and Richard Johnson; a glass of water and a blackened spoon on the bureau; and outside on a window ledge, a small plastic purse containing some bindles, some yellow pills and a needle. The officers then arrested Johnson and Miss Miller. Lieutenant Stephens and another officer remained in the house and a few minutes later Charles Miller, Michele's brother, came to the house, and on being questioned, told Lieutenant Stephens that Johnson and defendant had been receiving chemicals at the house under the name ''Associates in Research,'' and that Charles thought they were using the chemicals to make a dangerous drug.

While in custody at the jail, Miss Miller was permitted to call her attorney; a matron stayed in the room during the call and overheard Miss Miller tell her attorney that defendant could be reached at a certain telephone number. Miss Miller did not ask the matron to leave the room at any time. The matron wrote down the phone number and gave it to Officer Stephens, whereupon the Santa Rosa police traced the number through the telephone company to a party named Harold James at 2147 Crane Canyon Road.

On the 11th, the sheriff's office received a teletype from San Mateo County advising that defendant could be reached through a post office box at Penngrove. A deputy sheriff investigated and found that the box holder, who was identified by the postal employee from a picture carried by the deputy, was living at the Crane Canyon Road address. This deputy was assigned to work with Lieutenant Stephens of the police department.

On the way to the Crane Canyon address the officers discussed the defendant's narcotic background. This was the first information the deputy sheriff had concerning that subject. His sole interest was effecting service of the San Mateo County warrant. On arriving at the address about five miles out of town at 11:30 a.m., the officers found two isolated houses, one on top of a hill and one below. The deputy sheriff

went to the upper house and conversed with a woman who identified a picture of defendant as "Harold James," her tenant in the lower house. She stated that she did not think there was anyone there at that time, but she did not know.[1] There were no vehicles parked at the lower house. There were a few cars parked 30 or 40 yards away, but none at a parking place only 20 or 30 yards from the house. The deputy first testified that he knew before going to the house that defendant reportedly drove a wooden station wagon. Subsequently, after consulting his notes, he corrected his testimony by stating that he did not acquire such knowledge until after he had been to the premises. He did not know of any public transportation which would permit a person to reach the area.

The deputy identified the house rented by defendant to the lieutenant. As the two officers approached it they noticed a strong caustic smell. Lieutenant Stephens knocked loudly but there was no answer and no sound came from the house then or at any time later. While the deputy sheriff remained in the front, Stephens went around to the rear of the house and onto the back porch. There he saw that the back door was propped open with a can of bolts. He had often found that persons would hide in a house and not respond in order to avoid the service of a warrant. He concluded that someone was in the house because the door had been left propped open. Looking through the open door Stephens saw a large shed-like room containing some five-gallon cans. On entering the room he observed some chemicals. He then went out on the back porch again and called the deputy sheriff. The latter also concluded from the open door that someone was in the house. The officers entered the shed-like room and the deputy then for the first time related his full conversation with the landlady to Stephens. This was the first time that Stephens suspected that defendant might not be in the house. The officers decided to look for defendant through the rest of the building. They knocked on a closed door which led from the shed-like room to the rest of the house, and entered the unlocked door when they received no response. Stephens unsnapped the safety snap from his holster. They went through the house looking in

---

[1]The deputy testified before the magistrate: "So I asked her if anybody was around the premises, and she stated that, to the best of my recollection again, that she didn't think there was anyone there at that time, but she did not know; and she further stated that there was someone around there in the evenings." In the trial court he stated: "She stated that she didn't know exactly when he was there; they were in and out, sometimes in the afternoon, and sometimes in the evenings, but she didn't know exactly when he was there, or if he was there at that time."

closets and in the bathroom, but not in drawers, baskets, the medicine cabinet or other places where a man could not hide.

When it became obvious that no one was in the house, the officers looked over numerous boxes of chemicals, and equipment, on the premises. Stephens made notes of what he saw. It was this information which served as the basis for the evidence on which the search warrant was subsequently issued. There was no search for articles of evidence. The officers merely observed what was in plain sight. (See *People* v. *Carswell, supra,* 51 Cal.2d 602, 607-608; *People* v. *Roberts, supra,* 47 Cal.2d 374, 379; *People* v. *Jackson* (1961) 198 Cal. App.2d 698, 703 [18 Cal.Rptr. 214]; and *People* v. *Miller* (1961) 193 Cal.App.2d 838, 842-843 [14 Cal.Rptr. 704]; and cf. *People* v. *Schaumloffel* (1959) 53 Cal.2d 96, 100-102 [346 P.2d 393]; and *People* v. *Mills* (1957) 148 Cal.App.2d 392, 399-402 [306 P.2d 1005].)

Defendant points out that a search of a person's house is a drastic intrusion upon personal rights. (See *People* v. *Mills* (1967) 251 Cal.App.2d 420, 422 [59 Cal.Rptr. 489].) He relies upon *People* v. *Pease* (1966) 242 Cal.App.2d 442 [51 Cal.Rptr. 448], in which this court held that uncorroborated information from an undetermined source that the defendant was occupying certain premises would not justify an entry under a warrant of arrest, even though such information was relayed through official channels. (242 Cal.App.2d at pp. 445-450. Cf. *People* v. *Carswell, supra,* 51 Cal.2d 602, 607; and see Pen. Code, § 844.)[2]

Insofar as *Pease* requires identification of the source of the information concerning the defendant's whereabouts, it is not applicable to the facts of this case. The officers had determined from the postal employee and the landlady that defendant was the tenant of the building in question and was using it as his address. (See *People* v. *Griffin* (1967) 250 Cal.App.2d 545, 550, fn. 5 [58 Cal.Rptr. 707].) Defendant insists that the officers, before entering, must have reasonable grounds for believing that the defendant is inside at that time, and that the evidence compels a finding that there were no grounds for such belief. The magistrate and the trial judge have found to the contrary. Here the landlady's

---

[2]Penal Code section 844 provides in pertinent part: ''To make an arrest, a private person, if the offense be a felony, and in all cases a peace-officer, may break open the door or window of the house in which the person to be arrested is, or in which they have reasonable grounds for believing him to be, after having demanded admittance and explained the purpose for which admittance is desired.''

statement that she did not think there was anyone home, the absence of cars, the lack of public transportation, the silence which greeted the officers' knocks and their other activities, and the withdrawal of the officer watching the front entry, all point to a conclusion that the building was unoccupied. On the other hand, the landlady did not know whether the defendant was there or not. It is not uncommon for one resident to be at home without transportation while another is away, and the testimony indicates that on occasion a fugitive may remain silent and hide to avoid the service of a warrant. The officers could infer that defendant was apprised of the events of March 9th when he had been sought in Santa Rosa. (See *People* v. *Carswell, supra,* at p. 607; but cf. *People* v. *Stephens* (1967) 249 Cal.App.2d 113, 116-117 [57 Cal.Rptr. 66]; and *People* v. *Arellano* (1966) 239 Cal.App.2d 389, 392-393 [48 Cal.Rptr. 686].)

The People further seek to justify the rulings made below on the theory that there was no entry because the door was open. They further contend that there is no breaking open in violation of the statute where entry is made through an unlocked door. In *Williams* v. *United States* (9th Cir. 1959) 273 F.2d 781, the court looked to the law of California, Penal Code section 844, to determine the validity of an arrest by a state officer which resulted in the discovery of evidence which led to prosecution for a federal offense. The court upheld an arrest where the officers opened an unlocked door and entered without objection after receiving no response to their knocking. (273 F.2d at pp. 792-794. See also *Sabbath* v. *United States* (9th Cir. 1967) 380 F.2d 108, 111 [cert. granted (1968) 389 U.S. 1003 [19 L.Ed. 598, 88 S.Ct. 570]]; *Hopper* v. *United States* (9th Cir. 1959) 267 F.2d 904, 908; and *People* v. *Feeley* (1960) 179 Cal.App.2d 100, 104 and 105 [3 Cal.Rptr. 529]; but cf. *Hair* v. *United States* (1961) 289 F.2d 894, 895-897 [110 App.D.C. 153]; and Perkins, Criminal Law (1957) pp. 149-150.)[3] They further assert that only the outer door of a home is privileged against breaking by officers seeking to arrest an occupant, and that once the outer door has been peaceably entered an inner door may lawfully be broken. (*Lee* v. *Glansel* (K.B. 1774) 1 Comp. 1 [98 Eng.Rep. 935], alleged to govern by application of common law principles to the law of searches and seizures. See *People* v. *Maddox* (1956)

---

[3]The silence which greeted the officers' knocks dispensed with the necessity for any announcement of their purpose. (See *People* v. *Valles* (1961) 197 Cal.App.2d 362, 369 [17 Cal.Rptr. 204]; but cf. *People* v. *Stephens, supra,* 249 Cal.App.2d 113, 117.)

46 Cal.2d 301, 306 [294 P.2d 6]; and *Bruce* v. *Sibeck* (1938) 25 Cal.App.2d 691, 697-698 [78 P.2d 741].)

In *People* v. *Rosales* (1968) 68 Cal.2d 299 [66 Cal.Rptr. 1, 437 P.2d 489], the opinion states: ''The Attorney General contends that since the officers did no more than open an unlocked screen door and walk in, no 'breaking' within the meaning of the statute occurred. We do not agree with this contention. Although the common law rule was first articulated to regulate entry by force, it is not limited to entries effected by physical violence. Section 844 is a codification of the common law. (*People* v. *Maddox* (1956) 46 Cal.2d 301, 306 [294 P.2d 6].) At the very least, it covers unannounced entries that would be considered breaking as that term is used in defining common law burglary. (Rest.2d Torts (1965) § 206, com. b; Blakey, *The Rule of Announcement and Unlawful Entry; Miller* v. *United States and Ker* v. *California* (1964) 112 U.Pa.L.Rev. 499, 505; Wilgus, *Arrest Without a Warrant* (1924) 22 Mich.L.Rev. 798, 806.) As so defined, no more is needed 'than the opening of a door or window, even if not locked, or not even latched. Pulling open a screen door held closed only by a spring is sufficient.' (R. Perkins, Criminal Law (1957) 149, 150.) '' (68 Cal.2d p. 303 [fn. disapproving *People* v. *Feeley, supra,* omitted] ; see also *People* v. *Gastelo* (1967) 67 Cal.2d 586, 587-589 [63 Cal.Rptr. 10, 432 P.2d 706].)

It is unnecessary to determine to what extent *Rosales* and *Gastelo* qualify the rules advanced by the prosecution. The evidence, as has been noted, is sufficient to sustain the conclusion below that there were reasonable grounds to enter to serve the warrant.[4]

In returning to a consideration of the issuance of the search warrant itself, it is noted that there is some confusion as to just who said what to which officer, with respect to the fact that the observed chemicals were of a nature adapted to the manufacture of dangerous drugs. It suffices to state that there was sufficient evidence of conversation between members of the police department and personnel of the State Bureau of

---

[4]This case does not raise the question suggested by *People* v. *Chimel* (1968) 68 Cal.2d 436 [67 Cal.Rptr. 421, 439 P.2d 333]. There it was claimed that the search and seizure was illegal because it was attendant to the service of a warrant of arrest which was issued on an insufficient complaint. (See *People* v. *Sesslin* (1968) 68 Cal.2d 418, 422-426 [67 Cal. Rptr. 409, 439 P.2d 321].) The court found that there was in fact probable cause to arrest the defendant, and upheld the search (68 Cal.2d at pp. 440-443). In this case no attack was made on the validity of the San Mateo warrant, and the issue is not before the court.

Narcotics to warrant the magistrate finding there was reasonable cause to issue the warrant when he did, and to sustain his ruling and that of the trial court, upholding the legality of the search warrant.

▓▓▓▓ The fact that the police matron heard and reported the phone number mentioned in the codefendant's conversation with her attorney does not invalidate that information. No privilege of confidential communication attaches to a statement which is made in the presence of a third person who is ostensibly present. (*People* v. *Castiel* (1957) 153 Cal.App.2d 653, 659 [315 P.2d 79] ; *People* v. *White* (1929) 102 Cal.App. 647, 650 [283 P. 369] ; and see Evid. Code, § 952.) Furthermore, the address of defendant's premises was independently obtained by the deputy sheriff's investigation of the post office box. Any infirmity in the police department's information would not taint the sheriff's knowledge. (*People* v. *Ditson* (1962) 57 Cal.2d 415, 445 [20 Cal.Rptr. 165, 369 P.2d 714].)

The judgment is affirmed.

Molinari, P. J., and Elkington, J., concurred.

A petition for a rehearing was denied July 17, 1968, and appellant's petition for a hearing by the Supreme Court was denied August 14, 1968.