[Civ. No. 34076.  Second Dist., Div. Five.  Aug. 15, 1969.]

LAWRENCE EDWARD LOCKRIDGE et al., Petitioners, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent; THE PEOPLE, Real Party in Interest.

Harvey A. Schneider, Max Solomon and Burton Marks for Petitioners.

No appearance for Respondent.

Evelle J. Younger, District Attorney, Harry Wood and Robert J. Lord, Deputy District Attorneys, for Real Party in Interest.

STEPHENS, Acting P. J.—In count I of an information filed on November 27, 1967, the three petitioners (Lawrence Edward Lockridge, Roger Allen Lockridge, and Frank Tierno) were charged with conspiring to violate Penal Code sections 459, 464, 484, 496 and 466, in violation of Penal Code section 182, subdivision 1. For ease of reference, the Lockridge brothers will hereinafter be referred to by first name. Counts III and IV charged petitioners with violating Penal Code section 459; count V charged a violation of Penal Code section 464; and counts X and XI charged violations of Penal Code section 496. Petitioners Lawrence and Roger were charged in count VI with an additional violation of Penal Code section 459; in count IX, with an additional violation of Penal Code section 496; in count VII, with a violation of Penal Code section 209; and in count VIII, with a violation of Penal Code section 211.

Count II charged petitioners with conspiracy to prevent and obstruct justice and the due administration of the laws, in violation of Penal Code section 182, subdivision 5; this count was thereafter dismissed, pursuant to petitioners' motions under Penal Code section 995. Petitioner (defendants below) entered pleas of not guilty on all remaining counts and moved to suppress evidence on all of the statutory grounds under Penal Code section 1538.5. After a special hearing, the motion under section 1538.5 was denied and petitioners thereupon filed the instant petition for a writ of mandate or prohibition. (Pen. Code, § 1538.5, subd. (i).) We issued an alternative writ of mandate.

This is a complex case involving numerous arrests and searches conducted over a substantial period of time. The transcript of the section 1538.5 proceedings extends to over 1,000 pages. Accordingly, a general summary of facts will be

initially outlined, followed by a fuller explication of the evidence where necessary to a resolution of the multifarious contentions advanced by petitioners.

On August 25, 1967, Officer Staub of the Santa Barbara Police Department, while on patrol, received information from the police dispatcher that a silent alarm at the B. D. Howes Jewelry Company had just been set off. Enroute to the location, he observed a white Thunderbird automobile, license number NPS 214, parked around the corner from the jewelry store and occupied by a person in the driver's seat. Upon arrival at the rear of the jewelry store, at 6 :35 a.m., the officer observed a man, subsequently identified as Lawrence, descend from a telephone pole and walk away. Officer Staub accosted Lawrence and observed that he was wearing a telephone lineman's belt and carrying other telephone equipment, but was otherwise attired in normal street clothing. There was no telephone company car in the area. Lawrence stated that he was employed by the General Telephone Company and was checking for short circuits. He produced a driver's license in the name of James A. Fallon, but was unable to produce identification from the General Telephone Company. As Officer Staub and Lawrence approached the police car, Staub saw the white car drive away. A check of the records of General Telephone revealed that no person named James Fallon was employed by them, and the suspect was unable to furnish the name of his immediate supervisor or his employee number. Lawrence was placed under arrest for suspicion of violating Penal Code section 591 (tampering with telephone wires).

Officer Staub radioed the license number of the white Thunderbird to the dispatcher, who in turn requested a registration check from the Highway Patrol. Information received from the Highway Patrol disclosed that the license plates were registered to James Fallon. At approximately 8 :30 in the morning of August 25, 1967, Roger was arrested on suspicion of violating Penal Code section 591 (tampering with telephone wires). He was arrested approximately six blocks from the jewelry store when officers observed him getting into a white Thunderbird with the license number NPS 214.

An APB (all points bulletin) teletype was issued by the Santa Barbara Police Department directed to all burglary details, and in particular, to Sergeant Lovold of the Los Angeles Police Department burglary detail. The teletype related to the circumstances attendant upon the activation of the silent alarm at the B. D. Howes jewelry store. Later, on

August 25, 1967, Sergeant Lovold traveled to Santa Barbara because he had formed the opinion that due to the unique method used in attempting to circumvent the silent alarm system, Roger and Lawrence had been involved in two burglaries in Los Angeles during the months of June and July.

When booked in Santa Barbara, Lawrence had on his person a sales receipt for clothing sold to "J. Fallan [*sic*], 4455 Los Feliz, Apt. 904—L.A. 27." Lawrence, however, gave his address as 327 N. Isabel, Glendale. Roger, at the time of booking, had in his possession safe deposit key number W-6139, and listed his address as 901 Glenwood Road. Roger and Lawrence, in addition to the tampering charge, were also charged with attempted burglary, in violation of Penal Code section 459. Subsequently, the charges against Roger were dismissed. Lawrence pleaded guilty to the offense of trespassing.

Sergeant Lovold returned to Los Angeles, and on August 28, 1967 initiated the issuance of search warrant 1657, and searched apartment 904 at 4455 Los Feliz Boulevard. In executing search warrant 1657, police officers discovered, among other things, a receipt for safe deposit box number 2498 in the name of Lawrence at the Security First National Bank, Burbank Branch, located at 101 South San Fernando Boulevard. This led to the issuance of search warrant 1659 on August 29, 1967, authorizing a search of safe deposit box number 2498. On August 30, 1967, search warrant 1660 was issued, authorizing a search of safe deposit box number W-6139 at the Bank of America, Burbank Branch, for property not recovered, but described in search warrant 1657. In executing search warrant 1660, police officers observed 15 wiggle keys in safe deposit box number W-6139.[1] Because search warrant 1660 was not issued for the seizure of such keys, on August 30, 1967 search warrant 10 was issued, authorizing the seizure of these keys. In addition, this warrant authorized a search of 901 Glenwood Road, Glendale, and a 1964 Chevrolet, license number HCT 016, registered to Roger, to recover the remainder of the unrecovered stolen property which was the object of search warrant 1657.

On October 13, 1967, Lawrence was arrested at 327 Isabel Street, Apartment 2, Glendale pursuant to an arrest warrant. The white Thunderbird in which Roger had been arrested in Santa Barbara was parked approximately 75 feet from the

[1] A wiggle key is a type of key used to "jimmy" a lock and to trip the tumblers without the use of the lock-key.

Glendale apartment. A search thereof was made. Roger and Frank Tierno were also arrested on this date.

*Arrest of Roger Lockridge on August* 25, 1967

██ Petitioner Roger contends that his arrest in Santa Barbara on August 25, 1967 was without probable cause. The propriety of this arrest is properly before us. As stated in *People* v. *Curtis,* 70 Cal.2d 347, 352 [74 Cal.Rptr. 713, 450 P.2d 33] : ██ "An arrest. is a 'seizure' and an arrest without a warrant or probable cause is 'unreasonable' within the purview of the Fourth Amendment."

Following the time Officer Staub received information from his police dispatcher that a silent alarm at the B. D. Howes Jewelry Company had just been set off, on that morning, the officer proceeded to the jewelry company and upon arriving at the scene observed a white Thunderbird Ford automobile parked around the corner, with a male Caucasian seated behind the steering wheel. No other cars were parked on the street at that early hour. The officer drove his police vehicle into an alley at the rear of the store to determine if there had been forced entry. The officer was unable to observe any signs of a forced entry, but it was during this investigation that he saw defendant Lawrence descend from the telephone pole and walk away. This telephone pole was approximately 100 feet distant from the store in question. The officer asked Lawrence to accompany him to the police vehicle and upon their approaching the police vehicle, the white Thunderbird drove off. The officer observed the profile of the person in the vehicle. He testified that this person looked like defendant Roger. When asked who was in the Thunderbird, Lawrence said, "I don't know."

Investigation by Officer Staub of the telephone pole disclosed that the lid to the terminal box at the top of the pole was open. Officer Staub called his dispatcher and gave him a description of the car and its license number and a general description of the occupant of the car. He requested his dispatcher to have a police radio message put out to the effect that the car *should be stopped until the investigation could be completed.* He also requested that additional officers be called in to try to locate "Fallon's" truck. The dispatcher requested a registration check on the license plates from the Highway Patrol, and received the information that the license plates were registered to "James Fallon." Officer Staub also asked his dispatcher to make a check with the General Tele-

phone Company to determine if a "James Fallon" was employed by them. The dispatcher called back and said that he had checked with the Santa Barbara office of the General Telephone Company and learned that there was no such person employed there. Confronted with this, Lawrence stated that he was in Santa Barbara temporarily and that he was working out of the Glendale office. The officer called the dispatcher, who again communicated with the local telephone company. The dispatcher contacted Officer Staub and told him that the defendant should know his employee number and the name of his supervisor. Officer Staub then asked Lawrence these questions and defendant stated that he did not know. It was at this time that Officer Staub placed Lawrence under arrest for tampering with a telephone line.

On the morning of August 25, 1967, at about 7 or 7:15 a.m., Officer Strong was alerted by the dispatcher to look for a white Thunderbird bearing license number NPS 214. He was also alerted to look for the driver, who was described as a white male adult. At 8 a.m., this officer saw the defendant Roger get into the car in question at a location approximately six blocks from the scene of the arrest of Lawrence.

■■■ There can be no question as to the existence of probable cause to arrest Lawrence. The question is whether there is a connecting link between the activities of Lawrence and those of Roger so as to furnish probable cause for the latter's arrest. The white Thunderbird was the only vehicle in the vicinity of a business establishment in which a silent alarm had been activated. It was approximately 6:30 a.m. when the vehicle was observed with a man seated in the driver's seat. And, of crucial significance, the license plates on the vehicle were registered to "James Fallon," the suspect already in custody. Clearly, from this latter factor, it is inferable that the driver of the vehicle was an accomplice of the person who represented himself to be James Fallon. We would have no difficulty at this point in concluding that these facts, known to Officer Staub, provided him with sufficient probable cause to authorize an arrest of Roger. Unfortunately, we are confronted with a total failure of proof by the prosecution as to the circumstances surrounding Roger's arrest. The record is devoid of any evidence as to what information was communicated to the arresting officer or officers, or, for that matter, who the arresting officer was. We know only that Officer Staub contacted the radio dispatcher and asked him to broadcast a description of the vehicle and request "that it be stopped

until the investigation could be completed.'' We are not even able to ascertain whether the broadcasting of this information occurred before or after learning that the license plates of the vehicle were registered to ''James Fallon.'' Lastly, we know that Detective Strong observed Roger entering the described vehicle at approximately 8:15 a.m. six blocks from the scene of Lawrence's arrest.

Due to the inadequacy of the present record, the arrest of Roger must be held to have been without probable cause under the doctrine of *People v. Superior Court,* 264 Cal.App.2d 165 [70 Cal.Rptr. 362]. In that case, officers received a physical description of defendant and instructions via police radio broadcast ''to pick up'' the defendant. The arresting officer ''did not know the facts which the police department contends were the cause of the arrest. He was not informed by headquarters as to why, if at all, an arrest should be made, and he was by his own admission totally ignorant of any cause to warrant an arrest.'' (*Id.,* at p. 171.) The facts of the present case, by omission, stand in the same posture. The abject failure of the prosecution to substantiate a causal relay of information to the arresting officers leads inexorably to the conclusion that their orders were only ''that it [the vehicle] be stopped until the investigation could be completed.'' Presumably, absent evidence to the contrary, the arresting officer or officers were unaware ''of the existence of any facts or charges which would warrant an arrest.'' (*Ibid.*) Under this state of the evidence, we are constrained to hold that the prosecution has failed to sustain its burden of proof that Roger's arrest without a warrant was based on probable cause to believe that he had committed a felony. (*People v. Johnson,* 68 Cal.2d 629, 632 [68 Cal.Rptr. 441, 440 P.2d 921].) More specifically, the People have failed to prove ''not only that the collective knowledge of the investigating authorities justified the arrest, but that such knowedge was funneled to the arresting officer either by imparting it to him or, more simply, *by the giving of an order or request to make the arrest* by someone who, in turn, was possessed of such collective knowledge.'' (Italics added.) (*People v. Rice,* 253 Cal.App.2d 789, 792 [61 Cal. Rptr. 394] ; see also *People v. Hunt,* 250 Cal.App.2d 311 [58 Cal.Rptr. 385].) Accordingly, the evidence obtained from petitioner Roger, including safe deposit key W-6139, as the result of the search conducted pursuant to what legally must be concluded to be an unlawful arrest should have been sup-

pressed. (*People* v. *Haven,* 59 Cal.2d 713, 719 [31 Cal.Rptr. 47, 381 P.2d 927].)

### Statements Made by Lawrence Lockridge

■ Petitioner Lawrence contends that statements made after his arrest on August 25, 1967, in Santa Barbara should not have been admitted into evidence because such statements were elicited in violation of *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. Preliminarily, our reading of the record reveals that such statements were made by Lawrence prior to his arrest. The question before us then is whether such statements were elicited during the investigative stage or after defendant was in custody, though not formally arrested. ■ The warnings required by *Miranda* apply only to custodial interrogation, which is questioning initiated by law enforcement officers while an individual is in custody or otherwise deprived of his freedom in any *significant* way. (*Miranda* v. *Arizona, supra,* at p. 444 [16 L.Ed.2d at p. 706].) In its excellent discussion of the distinction between temporary detention for investigation and that species of more permanent restraint which rise to the dignity of custody, the court, in *People* v. *Manis,* 268 Cal. App.2d 653, 669 [74 Cal.Rptr. 423] held: "We conclude that persons temporarily detained for brief questioning by police officers who lack probable cause to make an arrest or bring an accusation need not be warned about incrimination and their right to counsel, until such time as the point of arrest or accusation has been reached or the questioning has ceased to be brief and casual and become sustained and coercive." [Footnote omitted.] While temporary detention does subject a citizen to some restraint and does temporarily curtail freedom of movement, the person detained is "in no sense an accused but rather one merely suspected of misconduct." (*Id.,* at p. 667.) General on-the-scene questioning which may thereafter take place during such detention is designed to bring out the person's explanation or lack of explanation of the circumstances which aroused the suspicion of the police, thus enabling the police to quickly ascertain whether such person should be permitted to go about his business or held to answer charges. ■ This is precisely what occurred in the instant case. Officer Staub observed the suspect Lawrence engaged in what the officer reasonably believed to be suspicious conduct. Lawrence was thereafter temporarily detained and asked for an explanation of his conduct. He stated that he was employed by General Telephone Company, but was

unable to produce any identification to verify his statement. The questions asked and responses elicited during such temporary detention were merely investigative, and no warning was required by the police as to self-incrimination or the right to counsel. When the explanation of Lawrence proved to be false, he was immediately placed under arrest and advised of his rights. We are convinced that Lawrence received all the protection that *Miranda* requires.

## Retention of Seized Evidence

■ Throughout their brief, petitioners complain that certain items of evidence were retained by the police for an unreasonable length of time. Conceding, without deciding, that the period of retention was unreasonable, we do not believe that such issue is either litigable or reviewable under Penal Code section 1538.5. That section pertains to the lawfulness of an initial search and seizure, not a subsequent retention. Consequently, the argument advanced by petitioners that an unreasonable period of retention renders evidence inadmissible is untenable.

## Validity of Search Warrant No. 1657

Petitioners attack the validity of search warrant No. 1657 on numerous grounds. It is necessary to consider only two aspects of the warrant and the method in which it was executed.

## Sufficiency of the Affidavit

■ The Fourth Amendment, whose proscriptions are applicable to the states under the Fourteenth Amendment (*Aguilar* v. *Texas*, 378 U.S. 108, 110 [12 L.Ed.2d 723, 725, 84 S.Ct. 1509]; *Ker* v. *California*, 374 U.S. 23, 33 [10 L.Ed.2d 726, 737, 83 S.Ct. 1623]), provides that ". . . no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." (See also Cal. Const., art. I, § 19; Pen. Code, § 1525.) In *People* v. *Scoma*, 71 Cal.2d 332, 335 [78 Cal.Rptr. 491, 455 P.2d 419], it is stated: "A search warrant is issued without probable cause, and therefore in violation of constitutional proscriptions, when the affidavit upon which it is based contains no competent evidence sufficient to support the finding of the magistrate. (*People* v. *Stout* (1967) 66 Cal.2d 184, 193 [57 Cal.Rptr. 152, 424 P.2d 704]; see *People* v. *Govea* (1965) 235 Cal.App.2d 285, 297 [45 Cal.Rptr. 253].) The indicated ques-

tions of competency and sufficiency are questions of law. (*People* v. *Stout, supra,* 66 Cal.2d 184, 193; *People* v. *Tillman* (1965) 238 Cal.App.2d 134, 137 [47 Cal.Rptr. 614]; *People* v. *Govea, supra,* 235 Cal.App.2d 285, 297.)'' After an intensive examination of the present affidavit, we have concluded as a matter of law that there is no competent evidence sufficient to establish probable cause for the issuance of the search warrant in question. Initially, from the testimony elicited during the Penal Code section 1538.5 hearing, it is at once evident that numerous allegations in the affidavit are either false or erroneous. Indeed, the People concede the incorrectness of two such allegations, although it is strongly urged that such errors were made in good faith. Good faith, however, is immaterial, and cannot serve to rehabilitate an otherwise defective warrant. (*Beck* v. *Ohio,* 379 U.S. 89, 97 [13 L.Ed.2d 142, 148, 85 S.Ct. 223].) In *Rugendorf* v. *United States,* 376 U.S. 528, 532 [11 L.Ed.2d 887, 891, 84 S.Ct. 825], the court considered the effect of factual inaccuracies in an affidavit in support of a search warrant, but concluded that such inaccuracies in the affidavit under consideration ''were only peripheral relevancy to the showing of probable cause, and, not being within the personal knowledge of the affiant, did not go to the integrity of the affidavit.'' Presumably, had the inaccuracies impugned the integrity of the affidavit, a different result would have been reached. Thus, in *United States* v. *Roth,* 391 F.2d 507, 509, where a contradiction existed between the testimony elicited at the hearing on the motion to suppress and the facts set forth in the affidavit, a ''fatal flaw'' was exposed, ''glaring enough to require the trial court to find the affidavit insufficient as a matter of law.'' (Footnote omitted.) It would be fallacious in the present case to classify the ''factual inaccuracies'' as being of only peripheral relevance. Nevertheless, we need not rest our decision on this basis, since if we excise the inaccuracies from the affidavit, which we think it incumbent upon us to do (*Rugendorf* v. *United States, supra*), it is at once evident that there is a paucity of information from which a magistrate would conclude that there was probable cause for the issuance of the search warrant. In essence, the affidavit, absent the erroneous content, contains the following allegations:

1. Affiant, a police officer for 25 years with 18 years experience investigating burglaries, has testified between 25 to 50 times as an expert on the modus operandi of burglaries.

2. On August 25, 1967, affiant investigated an attempted burglary at the B. D. Howes Jewelry Store in Santa Barbara.

The burglar alarm system at the store had been tampered with in a peculiar way known to the affiant as the same method used in two burglaries in Los Angeles which affiant had investigated.

3. Affiant spoke to Mr. B. D. Howes and learned that Mr. Howes observed two men in his Los Angeles store who appeared to be casing his store for a burglary. The license number of the car the men left in was found to be registered to one of the two men arrested for attempted burglary of the Howes store in Santa Barbara. The various burglary and arrest reports are incorporated by reference.

4. On the person of "James Fallon" was found a sales slip bearing the address for which this search warrant is sought. A confidential informant told the affiant that "James Fallon" is an alias for Lawrence Lockridge. Telephone company records list a James Fallon as a subscriber at the address sought to be searched.

5. Based on the above facts, affiant believes that property stolen from the Marvin Hime and Garcia Bros. Jewelry Stores is likely to be found at the residence of James Fallon.

The first item merely reflects background data concerning the qualifications of the affiant. The third item, although based on permissible hearsay, arouses the suspicion that Roger and Lawrence may be involved in burglary activities in Los Angeles. This information, however, pertains to the B. D. Howes Jewelry Store rather than the Marvin Hime or Garcia Bros. Jewelry Stores. This allegation, absent a connecting link with the latter two stores, is "but a bald and unilluminating assertion of suspicion that is entitled to no weight in appraising the magistrate's decision." (*Spinelli* v. *United States,* 393 U.S. 410, 414 [21 L.Ed.2d 637, 643, 89 S.Ct. 584]; *Nathanson* v. *United States,* 290 U.S. 41, 46 [78 L.Ed. 159, 161, 54 S.Ct. 11].) The fourth item provides the link between James Fallon and the premises sought to be searched. The allegation, however, that a confidential informant told the affiant that James Fallon is Lawrence Lockridge fails to satisfy the twin critera set forth in *Aguilar* v. *Texas, supra,* 378 U.S. 108, 114 [12 L.Ed.2d 723, 728], that the magistrate be informed of some of the underlying circumstances on which the informant's conclusion is based, and some of the underlying circumstances from which the affiant concluded that the informant was reliable. (See *Spinelli* v. *United States, supra,* 393 U.S. 410, 413 [21 L.Ed.2d 637, 641]; *People* v. *Hamilton,* 71 Cal.2d 176, 180 [77 Cal.Rptr. 785, 454

P.2d 681]; *People* v. *Scoma, supra,* 71 Cal.2d 332, 336.) The crucial allegation in this affidavit is found in the second item wherein the affiant states that he observed a burglar alarm system in Santa Barbara that had ben tampered with *"in a peculiar way known to your affiant"* as the same method used in two burglaries in Los Angeles which the affiant had investigated. No underlying factual circumstances are offered in the affidavit itself to support this conclusionary statement. The burglary reports, however, of the Marvin Hime, Garcia Bros. and B. D. Howes (Santa Barbara) Jewelry Stores are incorporated by reference. These reports indicate that the perpetrators of each of the Los Angeles burglaries bypassed the silent alarm system by the use of jumper wires at a telephone terminal box. Here again, however, we are confronted with conclusionary statements supported only by the suppositions of the officers as to what the perpetrators must have done. We have no way of knowing whether such statements were made on the basis of verifiable data or as a matter of pure conjecture. Furthermore, there is no indication that the officers who signed the respective burglary reports made such statements from personal knowledge. Of more significance, there is no information in the affidavit to support a determination that the modus operandi was so distinctively peculiar that a reasonable probability existed that whoever used this method in Santa Barbara also used it in Los Angeles. None of the underlying circumstances from which such a deduction can be made are set forth. What is or is not a distinctive modus operandi has recurrently plagued our courts (see *People* v. *Haston,* 69 Cal.2d 233 [70 Cal.Rptr. 419, 444 P.2d 91]; *People* v. *Cavanaugh,* 69 Cal.2d 262 [70 Cal.Rptr. 438, 444 P.2d 110]), and though we recognize that affidavits of probable cause are tested by much less rigorous standards than those governing the admissibility of evidence at trial (*McCray* v. *Illinois,* 386 U.S. 300, 311 [18 L.Ed.2d 62, 70, 87 S.Ct. 1056]), surely some supportive reasons or information should have been set forth from which the issuing magistrate could have concluded that this was indeed a "peculiar way" of defeating a silent alarm system. In the final analysis, there is simply no sufficient link to sustain a magistrate's finding of probable cause to believe that the perpetrators of the attempted offense in Santa Barbara were probably the perpetrators of the completed offenses in Los Angeles, and hence the stolen property from these latter offenses was probably secreted at the residence of one of the men apprehended in

Santa Barbara. We necessarily conclude that the search warrant in question was based on an insufficient affidavit, and was issued without probable cause.

## Lack of Specificity

There is yet another defect in this particular search warrant. The warrant commanded a search of certain described premises to recover merchandise stolen from two separate jewelry stores. A detailed inventory of the merchandise stolen from the Marvin Hime Jewelry Store was attached and incorporated into the warrant. No corresponding specificity of stolen merchandise is set forth with regard to the Garcia Bros. burglary. In fact, not one item·purportedly stolen from this store was specified in the warrant. The affidavit merely incorporated the burglary report which reported that approximately $1,000 in cash and $150,000 in merchandise was stolen. The requirement that a search warrant shall *particularly* describe the things to be seized (*Marron* v. *United States*, 275 U.S. 192, 196 [72 L.Ed. 231, 237, 48 S.Ct. 74]; Pen. Code, §§ 1525, 1529) would cease to be meaningful were we to sustain the warrant before us. There is simply no meaningful restriction placed on the objects to be seized. (*Aday* v. *Superior Court*, 55 Cal.2d 789, 796 [13 Cal.Rptr. 415, 362 P.2d 47]; *People* v. *Barthel*, 231 Cal.App.2d 827, 832 [42 Cal.Rptr. 290].) The only explanation offered by the People for this total lack of specification is that a complete inventory of the merchandise stolen from the Garcia Bros. Jewelry Store was not available. It should be noted, however, that the Garcia Bros. burglary occurred on or about June 5, 1967, and the search warrant was issued on August 28, 1967. The burglary of the Marvin Hime Jewelry Store occurred on or about July 1, 1967, and yet, as previously mentioned, a full inventory of the merchandise stolen from this store was incorporated into the warrant. There is no showing that a similar inventory of the Garcia Bros. merchandise could not have been obtained in the more than two months preceding the issuance of the warrant. Furthermore, the presumed resident of the premises, Lawrence Lockridge, was in custody and several officers were keeping the premises under surveillance. A warrant, such as that in the present case, which does not comply with the essential statutory and constitutional requirements relating to particularity of description is similar to a general warrant and is therefore invalid on its face. (*People* v. *Berger*, 44 Cal.2d 459, 461-462 [282 P.2d 509].) In view of the foregoing

infirmities, we conclude that the search warrant failed to conform to constitutional requirements and was therefore issued in violation of the Fourth and Fourteenth Amendments.

### Non-Compliance With Penal Code Section 1531

■ In executing search warrant number 1657, the police officers involved failed to comply with the mandatory provisions of Penal Code section 1531.[2] The People, relying upon *People* v. *Cox,* 263 Cal.App.2d 176 [69 Cal.Rptr. 410], contend that compliance with that section was excused because the officers believed that no one was inside the apartment sought to be searched. It is interesting to note that notwithstanding the officers' beliefs, that the premises were unoccupied, they did in fact knock on the door although they failed to announce their identity and the purpose for which admittance was desired, and further, that the affidavit in support of the search warrant requested permission to search at any time, day or night, since it was unknown "what other confederates . . . may have . . . access to the residence. . . ." A factual resolution of this issue is unnecessary. In the recent case of *Greven* v. *Superior Court,* 71 Cal.2d 287, 294 [78 Cal.Rptr. 504, 455 P.2d 432], our Supreme Court repudiated the notion, suggested in *People* v. *Cox, supra,* 263 Cal.App.2d 176, 186, fn. 3, that "[t]he silence which greeted the officers' knocks dispensed with the necessity for any announcement of their purpose" or, by implication, their authority. We hold that the entry in this case was not effected in compliance with the provisions of section 1531 of the Penal Code.

The People, in their opening brief, concede that the remaining search warrants are dependent for their validity on the sufficiency of the original warrant. Since we have concluded that the original warrant is constitutionally deficient, the remaining warrants are also invalid.

■ Unfortunately, the sole basis upon which the People rely to predicate probable cause for the arrest of Lawrence on October 13, 1967, is the evidence uncovered through execution of the various search warrants. On the record before us, the arrest of Lawrence must be held to have been without probable cause as a result of evidence secured through unlawful searches and seizures. (*Wong Sun* v. *United States,* 371 U.S. 488 [9 L.Ed.2d 455, 83 S.Ct. 407].) The subsequent search of

---

[2]Penal Code section 1531: "The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute his warrant, if, after notice of his authority and purpose, he is refused admittance."

petitioner's house pursuant to his unlawful arrest is likewise invalid (*People* v. *Coleman*, 235 Cal.App.2d 612 [45 Cal.Rptr. 542]), as is the ensuing search of petitioner's vehicle, though predicated on the theory of consent. (*People* v. *Mitchell*, 251 Cal.App.2d 641 [59 Cal.Rptr. 677].)

The remaining contentions advanced by petitioners relate to an incident occurring in 1965, and are, in view of our resolution of other issues presented, of dubious relevancy. Accordingly, these contentions need not be considered.

While we have determined that the issuance of the peremptory writ is here proper, we are mindful of the fact that there was a section 995 Penal Code motion heard and determined by the same judge who thereafter heard the section 1538.5 motion.[3] We know that the judge ruled adversely to defendants on that 995 motion, having before him the evidence adduced at the preliminary hearing. We know that an appeal from that ruling, in accordance with section 999a Penal Code was likewise determined adversely to defendants. Of course, we do not know what additional evidence, if any, was contained in the record of the preliminary hearing, as distinct from the 1538.5 hearing. After a careful review by the prosecution of the record of the preliminary hearing, the 1538.5 hearing and any other evidence available, it may be determined that *additional evidence* might be elicited by the prosecution, providing the trial court grants a motion to produce "additional evidence relating to the motion and not presented at the special hearing" upon a show[ing of] good cause at the trial why such evidence was not presented at the special hearing and why the prior ruling at the special hearing should not be binding."[4]

By issuance of this writ, we do not intend to preclude the prosecution from moving under section 1538.5, subdivision (j), as we have noted, as is their right under proper circum-

[3]Penal Code section 1538.5, subdivision (i) reads, in pertinent part, as follows: "The defendant shall have the right to litigate the validity of a search or seizure de novo on the basis of the evidence presented at a special hearing."

[4]Penal Code section 1538.5, subdivision (j) reads, in pertinent part, as follows: "If defendant's motion is granted at a special hearing in the superior court, the people, if they have additional evidence relating to the motion and not presented at the special hearing, shall have the right to show good cause at the trial why such evidence was not presented at the special hearing and why the prior ruling at the special hearing should not be binding, or the people may seek appellate review as provided in subdivision (o) of this section, unless the court prior to the time of such review is sought has dismissed the case pursuant to Section 1385. . . . If the people prosecute review by appeal or writ to decision, or any review thereof, in a felony or misdemeanor case, it shall be binding upon them."

stances. Likewise, we do not intend by such reference to section 1538.5, subdivision (j) to suggest that there ·is either "additional evidence" or that there exists "good cause . . . why such evidence was not presented at the special hearing." These are matters to be determined by the prosecution, in the first instance, and by the trial court, in the second.

Let a peremptory writ of mandate issue requiring the respondent court to vacate its previously entered order and enter a new and different order in accordance with the views expressed herein. The alternative writ of mandate is discharged.

Aiso, J., concurred.

A petition for a rehearing was denied September 4, 1969.