12 Cal.3d 731 (1974)
528 P.2d 1
117 Cal. Rptr. 393
THE PEOPLE, Plaintiff and Respondent,
v.
CHARLES EDWIN HILL, JR., et al., Defendants and Appellants.
Docket No. Crim. 17037.
Supreme Court of California. In Bank.
November 12, 1974.
*738 COUNSEL
Constantine P. Matthews, under appointment by the Supreme Court, John D. Taves, under appointment by the Court of Appeal, Paul R. Falzone, Thomas H. Frankel and David M. Weetman for Defendants and Appellants.
Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, A. Wells Petersen and Jay M. Bloom, Deputy Attorneys General, for Plaintiff and Respondent.
OPINION
WRIGHT, C.J.
Defendants appeal from judgments entered upon pleas of guilty of murder (Pen. Code, § 187), stipulated to be of the second degree.[1] The pleas of guilty were entered following denials of motions, *739 inter alia, to suppress items of evidence obtained as the result of searches and seizures and to suppress a witness' identification of defendant Hill. (§ 1538.5.)[2]
Defendants contend (1) that the trial court committed prejudicial error in refusing to suppress various items of evidence seized as the result of unlawful searches and (2) that the trial court incorrectly ruled that a witness' identification of Hill was not tainted by an allegedly impermissible photographic identification procedure (see Simmons v. United States (1968) 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253, 88 S.Ct. 967]). Defendant Schnabel additionally contends that a statement he made immediately prior to his arrest and which he sought to suppress is inadmissible because it was obtained without compliance with the requirements of Miranda v. Arizona (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R. 3d 974]. We hold (1) that although the denial of defendants' motion pursuant to section 1538.5 was correct with respect to most of the challenged evidence, the trial court should have suppressed certain items seized in violation of Fourth Amendment proscriptions and (2) that the claims of error concerning the witness' identification evidence and the alleged violation *740 of defendant Schnabel's Miranda rights may not properly be raised on this appeal because defendants failed to secure a certificate of probable cause as required by section 1237.5 and California Rules of Court, rule 31(d). We further hold that since defendants' pleas of guilty were entered following the erroneous denial of their motion to suppress certain items of evidence, they are entitled to the relief hereinafter provided.
On the evening of December 17, 1970, Stephen Paul Smith, the murder victim, and David Lee McElhinney drove to a Juanita Street residence owned by Amelia Hernandez for the purpose of purchasing a quantity of marijuana. They arrived at approximately 6 p.m. and were admitted after Smith identified himself. They stepped into a livingroom which was dimly lit by what appeared to be a candle; the shades were drawn and there was no other artificial lighting. Immediately thereafter a man appeared in the doorway to an adjoining bedroom, pointed a revolver at Smith and McElhinney and ordered them to lie on the floor. McElhinney could see only the silhouette of the gunman because of the poor lighting conditions in the room. None of the features of the gunman was discernible. McElhinney promptly complied with the gunman's order but Smith protested. McElhinney, lying on the floor, heard a scuffle and briefly glimpsed Arthur "Tudy" Hernandez run from the bedroom. At this point a shot was fired and Smith fell to the floor across McElhinney's legs. Moments later McElhinney's wallet was removed from his pocket and he was rolled over onto his back by one of the assailants. The barrel of a revolver was pointed directly at his right eye and the beam of a flashlight was directed into his left eye. McElhinney was questioned as to the whereabouts of Smith's wallet and then was rolled back onto his stomach. After locating Smith's wallet two men ran out through the back door of the house and fled. During the few seconds before his vision was impaired by the flashlight and the gun barrel, McElhinney caught a glimpse of the upper portion of the face of his assailant.
Immediately after the two assailants had fled Arthur Hernandez entered the room and he and McElhinney carried Smith outside, placed him in an automobile owned by Mrs. Annette "Sparky" Hernandez and drove to a hospital. Prior to reaching their destination Mrs. Hernandez was allowed to leave the automobile, as it was her husband's wish that she not become involved in whatever ensued.[3] Smith was dead upon arrival at the hospital, and McElhinney and Hernandez were questioned by sheriff's *741 deputies. Hernandez was arrested that same evening and charged with the murder of Smith.[4]
At approximately 6:30 p.m. on the evening of the murder, some 12 miles from the murder site, defendants were arrested in an unrelated incident. Highway Patrol Officer Quaschnick had observed a Pontiac automobile as it failed to make a required stop. Quaschnick followed and the Pontiac was accelerated to speeds well in excess of the lawful limit. The car finally came to a stop after having taken evasive action with Quaschnick in pursuit. The Pontiac was driven by Hill and Schnabel was a passenger therein.
Quaschnick alighted from his patrol car and ordered Hill out of the Pontiac. Hill complied and explained his attempt to flee by stating that he did not wish to be stopped as he did not have his driver's license in his possession. Quaschnick thereupon arrested Hill for reckless driving, handcuffed him and placed him in the patrol car.
While the foregoing was taking place Officers Smith and Sharp arrived at the scene in response to Quaschnick's radio report of his pursuit of the Pontiac. Smith alighted from his patrol car and observed Schnabel who stepped out of the Pontiac and walked towards Smith. Smith ordered Schnabel to halt and then conducted a pat-down search for weapons. During the course of the pat-down, Smith observed a large roll of money protruding from Schnabel's jacket pocket. Smith asked Schnabel the source of the money and Schnabel replied "Wheeling and dealing." Smith also felt a hard, square object in Schnabel's pants pocket which, upon removal, appeared to be a matchbox about three inches long secured by rubber bands. The box seemed unusually heavy and when Smith shook it he heard a rattling sound. Smith opened the box and saw six.32 caliber bullets. He placed Schnabel under arrest for suspicion of armed robbery.
Hill told Quaschnick that his name was Gary Pond and that the registration and other evidence of ownership of the Pontiac were in the vehicle. While Smith was occupied with Schnabel, Quaschnick approached the Pontiac, the left front door of which had not been closed by Hill. Quashnick directed the beam of his flashlight onto the rear seat to ascertain whether any other persons were in the vehicle. He observed on the rear seat a cellophane-wrapped package of a size and shape which caused him to believe that it might contain marijuana. He also observed on the front *742 floorboards two wallets, miscellaneous scattered papers, and three hand-rolled cigarettes protruding from a pouch. At this point Quaschnick and Smith conferred for the first time. After relating to each other what they had observed, they decided to call for the sheriff to assist with an investigation into possible robbery or narcotic offenses. Quaschnick radioed for assistance and then returned to the Pontiac and noticed that the vehicle identification plate on the open front door appeared to have been tampered with.[5]
When Sheriff's Officer Thurlow arrived, Quaschnick informed him of all that had transpired. Thurlow looked into the Pontiac and seized the hand-rolled cigarettes; he broke one open and observed what he believed to be marijuana.[6] He also examined the vehicle identification plate. Thurlow arrested both Hill and Schnabel for possession of marijuana (Health & Saf. Code, § 11530) and auto theft (Veh. Code, § 10851). He also removed the roll of bills from Schnabel's pocket and counted it; there were 85 bills having a total value of $1,878.
At approximately 7:30 p.m. on the evening in question, Lieutenant Ringstad of the sheriff's department arrived at the Juanita Street residence to investigate the shooting.[7] Accompanied by other officers, Ringstad proceeded to the front porch and, after first peering through the windows with the aid of a flashlight, knocked on the door and loudly identified himself. When no response was received one of the other officers entered the house through an unlocked rear door and admitted Ringstad through the front door. The officers searched the entire house and seized a variety of articles.[8] There was no warrant for this search.
The following morning Ringstad was informed of defendant's arrest, of the large amount of money found on Schnabel, and of bloodstains observed on the hands of one of the defendants. Ringstad was also advised by other officers that upon a search of the chase route officers had found *743 an identification card belonging to one of the two victims of the robbery and murder at the Juanita Street residence. A further search of the chase route disclosed two wallets, an automatic pistol, a revolver, and an identification card belonging to McElhinney. Ringstad then proceeded to the garage where the Pontiac had been stored. After personally inspecting the vehicle he requested that an exhaustive search be conducted by a criminalist.[9] This search also was conducted without first obtaining a warrant.
Officers had learned of Annette "Sparky" Hernandez' role in the events surrounding the homicide during their interview with Mr. Hernandez and McElhinney after the two of them brought Smith's body to the hospital. An address book taken from Schnabel after his arrest contained an H Street listing for "Sparky and Tudy Hernandez."[10] On the day following the murder, Detectives Hardy and Rogers of the sheriff's department went to that address for the purpose of arresting Mrs. Hernandez. There was no answer when officers knocked on the door and announced their presence. The landlady, who lived on adjoining premises, told the officers that she had not seen Mrs. Hernandez that day and that there had been no activity at the house. The officers thereupon departed without entering the premises. Two days later, on December 20, Officer Hardy returned to the H Street residence in response to a call from the landlady. Upon his arrival he contacted the landlady who stated that Mrs. Hernandez was inside and that her car was at the rear of the building. Although there was light from a porch fixture, there appeared to be no lights on within the residence. Hardy pounded on the door, loudly announced his presence and demanded entry. Upon receiving no answer he requested the landlady to open the door with her passkey and she did so. Hardy walked through the entire house and ascertained that Mrs. Hernandez was not present. As he was walking out of the bedroom he noticed a personal telephone directory on a stand near the telephone. The directory was open and without touching it Hardy could read the names "Schnabel" and "Smith" with their respective telephone numbers. Hardy then departed without disturbing or removing anything. The entry of the H Street residence was also effected without a warrant.
The following day, December 21, Officer Hardy obtained a warrant to search the H Street residence. Accompanied by other officers Hardy knocked on the door and identified himself as a police officer. There was *744 no response and the landlady once again opened the door for them with her passkey. Once inside the officers conducted a search of the house and seized a variety of items as evidence.
On December 22 McElhinney was interviewed by Detective Rogers. At the conclusion of the questioning Rogers showed McElhinney a group of seven photographs. The photographs consisted of one each of Schnabel and Hill plus five others selected by Rogers because of their similarity to the pictures of defendants. Schnabel's photograph was sixth and Hill's was seventh in the group. The photographs of both Hill and Schnabel had "booking dates" on them of December 18, 1970. The five other "mug shots" all had dates on them which indicated that the bookings had taken place weeks and even months prior to the homicide. McElhinney selected Hill's photograph as the man who had pointed the gun and directed the flashlight into his eyes after Smith had been shot. McElhinney testified that he chose Hill's picture because the eyes, cheeks and hairline were similar to those of his assailant. At both the preliminary hearing on January 15, 1971, and at the hearing on the suppression motion on April 21, 1971, McElhinney made in-court identifications of Hill. On the latter occasion McElhinney testified that his identification was not influenced by the exposure of the photographs, and was based solely on his observation of Hill at the time of the homicide.
(1) We now turn to the issues presented on defendants' motions to suppress evidence. In ruling on such motions the trial court sat as a finder of fact with the power to resolve conflicts in the testimony. "On appeal all presumptions favor the exercise of that power, and the trial court's findings on such matters, whether express or implied, must be upheld if they are supported by substantial evidence." (People v. Lawler (1973) 9 Cal.3d 156, 160 [107 Cal. Rptr. 13, 507 P.2d 621]; see Evid. Code, § 402, subd. (c).)

The Pat-down Search of Defendant Schnabel.
(2) It is settled that circumstances short of probable cause to make an arrest may justify an officer's investigatory detention of a motorist and, if circumstances warrant, the officer may conduct a precautionary pat-down search for weapons. (Terry v. Ohio (1968) 392 U.S. 1, 27-30 [20 L.Ed.2d 889, 909-911, 88 S.Ct. 1868]; People v. Mickelson (1963) 59 Cal.2d 448, 450 [30 Cal. Rptr. 18, 380 P.2d 658]; People v. Martin (1956) 46 Cal.2d 106, 108 [293 P.2d 52].) A pat-down search is an intrusion which is constitutionally permissible only when the investigating officer reasonably believes it is necessary for his own protection or the safety of *745 others. (Terry v. Ohio, supra, 392 U.S. 1, 23-27 [20 L.Ed.2d 889, 907-909]; Sibron v. New York (1968) 392 U.S. 40, 63-64 [20 L.Ed.2d 917, 934-935, 88 S.Ct. 1889]; Cunha v. Superior Court (1970) 2 Cal.3d 352, 356 [85 Cal. Rptr. 160, 466 P.2d 704]; People v. Collins (1970) 1 Cal.3d 658, 661-662 [83 Cal. Rptr. 179, 463 P.2d 403].) Under some circumstances, accordingly, a pat-down search of a motorist may not be warranted even though stopping him for questioning was fully justified. (People v. Superior Court (Simon) (1972) 7 Cal.3d 186, 206 [101 Cal. Rptr. 837, 496 P.2d 1205]; People v. Griffith (1971) 19 Cal. App.3d 948, 951-952 [97 Cal. Rptr. 367]; People v. Adam (1969) 1 Cal. App.3d 486, 489-492 [81 Cal. Rptr. 738].)
(3a) Officer Smith testified that as he arrived on the scene he observed Hill and Schnabel alight from their automobile and walk towards the police officers.[11] Officer Quaschnick was already approaching Hill and Smith therefore directed his attention to Schnabel. Smith, who had responded to a radio call for assistance, knew that a high-speed chase had just occurred during which the fleeing driver had taken extremely dangerous evasive action.[12] (4) Police officers need not blind themselves to the knowledge, of which they are particularly aware, that automobiles are "frequently the facility for the perpetration of crime and an aid in the escape of criminals." (People v. Schader (1965) 62 Cal.2d 716, 724 [44 Cal. Rptr. 193, 401 P.2d 665].) Nor should we overlook the fact that "American criminals have a long tradition of armed violence" (Terry v. Ohio, supra, 392 U.S. 1, 23 [20 L.Ed.2d 889, 907]), and that a significant number of assassinations of officers occur when they are engaged in making routine traffic stops and investigations (see United States v. Robinson (1973) 414 U.S. 218, at p. 234, fn. 5 [38 L.Ed.2d 427, 440, *746 94 S.Ct. 467, 494]). (3b) The desperate attempt by Hill and Schnabel to avoid apprehension was sufficient to give rise to the reasonable inference that once their automobile was halted the occupants might attempt to forcibly resist an investigatory detention.[13] Consequently, Smith was justified in subjecting Schnabel to a precautionary pat-down search for weapons of assault. (People v. Martin, supra, 46 Cal.2d 106, 108; cf. People v. Mickelson, supra, 59 Cal.2d 448, 453-454.)
Having concluded that the frisk of Schnabel was justified at its inception, we must resolve the further question whether, as defendants contend, the search conducted by Smith exceeded its lawful scope. The controlling principles were articulated in Terry: (5) "A search for weapons in the absence of probable cause to arrest ... must, like any other search, be strictly circumscribed by the exigencies which justify its initiation. [Citation.]" (Terry v. Ohio, supra, 392 U.S. at pp. 25-26 [20 L.Ed.2d at p. 908].) Thus a pat-down must "be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs or other hidden instruments for the assault of the police officer." (Id., at p. 29 [20 L.Ed.2d at p. 911]; see also People v. Collins, supra, 1 Cal.3d 658, 662.)
(3c) Initially, Smith's frisk of Schnabel was properly limited to a patting of the outer clothing. During the course of this lawful conduct Smith felt and simultaneously saw a large roll of money which was visible inside Schnabel's open jacket pocket. As the bills were in plain view from a position from which Smith had a right to make observations, his discovery of the money was not the product of an impermissibly excessive intrusion. (Harris v. United States (1967) 390 U.S. 234, 236 [19 L.Ed.2d 1067, 1069-1070, 88 S.Ct. 992]; compare with Kaplan v. Superior Court (1971) 6 Cal.3d 150, 154 [98 Cal. Rptr. 649, 491 P.2d 1] and People v. Collins, supra, 1 Cal.3d 658, 662-663 [no plain view of item seized].) Continuing the limited search, Smith felt the matchbox and then removed it from Schnabel's pocket. We are not prepared to hold that under all the circumstances, which by then included the unexplained presence of a large *747 roll of currency together with Schnabel's evasive answer as to the source of the money, a prudent man could not have reasonably believed that a three-inch long, hard object might be an instrument of assault. Smith, therefore, was justified in reaching inside Schnabel's pocket and removing the matchbox. (See People v. Mosher (1969) 1 Cal.3d 379, 394 [82 Cal. Rptr. 379, 461 P.2d 659].)[14] Similarly, once the object was removed the further step of opening it and examining its contents was, under the circumstances then present, a reasonable precautionary measure. The box was much heavier than an ordinary matchbox and the rattling sounds indicated that it contained metallic objects other than matches. These factors warranted the additional precaution of examining the contents of the box so as to assure that the box or its contents could not be used to inflict injury upon the police officers.[15] The pat-down of Schnabel was thus constitutionally permissible with respect to both its inception and scope.

The Roadside Automobile Search.
(6) As with all warrantless searches the People carry the burden of proving that the roadside search of defendants' automobile was reasonable. (Badillo v. Superior Court (1956) 46 Cal.2d 269, 272 [294 P.2d 23].)
In Carroll v. United States (1925) 267 U.S. 132 [69 L.Ed. 543, 45 S.Ct. 280, 39 A.L.R. 790] the United States Supreme Court held that where police officers stop an automobile on the highway and there is probable cause to believe that it contains articles which are subject to seizure, an immediate warrantless search of the vehicle is permissible. We have stated that probable cause for such a search exists "where an officer is aware of facts that would lead a man of ordinary caution or prudence to believe, and conscientiously to entertain, a strong suspicion that the object of *748 the search is in the particular place to be searched." (People v. Dumas (1973) 9 Cal.3d 871, 885 [109 Cal. Rptr. 304, 512 P.2d 1208].)
In the case at bar Officer Quaschnick, without opening any doors or entering the automobile, observed what in the light of his experience appeared to be a "kilo" of marijuana on the rear seat and three hand-rolled marijuana cigarettes on the front floorboards.[16] This observation was not itself a "search" in the constitutional sense (Harris v. United States, supra, 390 U.S. 234, 236 [19 L.Ed.2d 1067, 1069-1070]; Guidi v. Superior Court (1973) 10 Cal.3d 1, 6, fn. 3 [109 Cal. Rptr. 684, 513 P.2d 908]; People v. Terry (1969) 70 Cal.2d 410, 428 [77 Cal. Rptr. 460, 454 P.2d 36]), and the use of a flashlight to illuminate the interior of the automobile is of no constitutional significance. (People v. Superior Court (Mata) (1970) 3 Cal. App.3d 636, 639 [84 Cal. Rptr. 81], and cases cited.)[17] Quaschnick's belief that there was marijuana in the automobile was strongly reinforced by the fact that the defendants had desperately attempted to avoid apprehension. Under these circumstances it was reasonable to conclude that the defendants were transporting contraband in their automobile. (People v. Terry, supra, 70 Cal.2d 410, 428; People v. Martin, supra, 46 Cal.2d 106, 108; People v. Superior Court (English) (1968) 266 Cal. App.2d 685, 690 [72 Cal. Rptr. 261]; People v. Anderson (1968) 266 Cal. App.2d 125, 130-133 [71 Cal. Rptr. 827].) Accordingly, when Sheriff's Deputy Thurlow arrived at the scene a few minutes later and was fully informed by Officers Quaschnick and Smith as to what had transpired, he was justified in searching the automobile and seizing the marijuana.[18]

*749 Probable Cause for Arrest.

(7) After searching the automobile Officer Thurlow arrested defendants for possession of marijuana and suspicion of auto theft. He had already examined the hand-rolled cigarettes and determined that they contained marijuana. While this evidence alone might not be sufficient to convict defendants of unlawful possession (see People v. Francis (1969) 71 Cal.2d 66, 71 [75 Cal. Rptr. 199, 450 P.2d 591]; compare People v. Crandall (1969) 275 Cal. App.2d 609 [80 Cal. Rptr. 81] with People v. Valerio (1970) 13 Cal. App.3d 912, 921-923 [92 Cal. Rptr. 82]), it is settled that the validity of an arrest is not tested by ascertaining whether the evidence upon which an officer acts is sufficient to convict. (People v. Ingle (1960) 53 Cal.2d 407, 412-413 [2 Cal. Rptr. 14, 348 P.2d 577].) The presence of the marijuana in the defendants' automobile, along with their attempt to escape constituted sufficient grounds to strongly suspect that both Hill and Schnabel were guilty of unlawful possession of marijuana. (People v. Lovejoy (1970) 12 Cal. App.3d 883, 887 [91 Cal. Rptr. 94]; People v. Ceccone (1968) 260 Cal. App.2d 886, 890 [67 Cal. Rptr. 499]; People v. Perez (1968) 259 Cal. App.2d 371, 378-379 [66 Cal. Rptr. 473].) We conclude, accordingly, that the arrest of both the driver and the passenger for possession of the marijuana found in the automobile was valid.[19]

The Post-impound Search of Defendants' Automobile.
(8) After defendants' valid arrests the officers properly impounded their automobile and removed it to a garage for safekeeping. (§ 849; Veh. Code, *750 §§ 22850, 22651, subd. (h).)[20] Defendants, relying on Preston v. United States (1964) 376 U.S. 364 [11 L.Ed.2d 777, 84 S.Ct. 881] and Dyke v. Taylor Implement Co. (1968) 391 U.S. 216 [20 L.Ed.2d 538, 88 S.Ct. 1472], contend that the warrantless search of their automobile on the following morning was constitutionally defective.
The authority to remove and store a vehicle under Vehicle Code sections 22850 and 22651, subdivision (h), does not ipso facto invest the police with authority to search the automobile for incriminating evidence. (People v. Burke (1964) 61 Cal.2d 575, 580 [39 Cal. Rptr. 531, 394 P.2d 67].) Nor does the right or necessity to take an inventory of the contents of an impounded automobile justify the type of probing and exploratory search that is at issue in the case at bar. (Mozzetti v. Superior Court (1971) 4 Cal.3d 699, 707-712 [94 Cal. Rptr. 412, 484 P.2d 84].) Further, the search of defendants' automobile at the storage garage on the morning following their arrest was too remote in both time (Preston v. United States, supra, 376 U.S. 364, 367-368 [11 L.Ed.2d 777, 780-781]) and place (Chimel v. California (1969) 395 U.S. 752, 762-763 [23 L.Ed.2d 685, 693-694, 89 S.Ct. 2034]) to be justified under the theory that it was incidental to defendants' arrest. (Coolidge v. New Hampshire (1971) 403 U.S. 443, 455-457 [29 L.Ed.2d 564, 576-578, 91 S.Ct. 2022].) Nor are we presented here with a situation in which the police held the automobile as evidence of a crime preparatory to initiating forfeiture proceedings as in Cooper v. California (1967) 386 U.S. 58 [17 L.Ed.2d 730, 87 S.Ct. 788].
In People v. Laursen (1972) 8 Cal.3d 192 [104 Cal. Rptr. 425, 501 P.2d 1145], which also involved a warrantless post-impound search of an automobile, we noted that in People v. McKinnon (1972) 7 Cal.3d 899 *751 [103 Cal. Rptr. 897, 500 P.2d 1097] we had "made it clear that a search without a warrant of an automobile or another readily movable item, founded upon probable cause, may be justified because of its `distinguishing characteristic of mobility' even though in otherwise similar circumstances a search of a fixed structure may be unreasonable within Fourth Amendment prohibitions." (People v. Laursen, supra, 8 Cal.3d 192, 201.) We further recognized that although McKinnon did not involve an automobile search it nevertheless rested on the reasoning of Chambers v. Maroney (1970) 399 U.S. 42 [26 L.Ed.2d 419, 90 S.Ct. 1975], in which the United States Supreme Court upheld the warrantless search of an automobile while it was parked outside the police station to which it had been driven after its occupants had been arrested. From Chambers and McKinnon we distilled the general rule "that when there is probable cause to believe that an automobile stopped on a highway contains contraband, evidence of a crime, or was itself an instrumentality of the commission of one, law enforcement officers need not obtain a warrant before conducting a search since there is no distinction of constitutional proportion between an immediate search on probable cause without a warrant and the automobile's immobilization until one is secured." (People v. Laursen, supra, 8 Cal.3d 192, 201.) We then proceeded to hold that the Chambers-McKinnon principle was equally applicable where police officers impound an automobile, tow it to a garage, and then search it. We reasoned that there was "no inconvenience or invasion of defendant's rights which further infringed any constitutional prohibition by the fact that the vehicle was removed from the scene of the crime to an impound garage beyond that which would have resulted had a warrant authorizing the impound and search first been obtained." (Id., at p. 202.)
In the case at bench the police officers were constitutionally empowered to search the defendants' automobile at the scene of their apprehension. (Carroll v. United States, supra, 267 U.S. 132.) As in Laursen the fact that the automobile was impounded and not searched until later at a garage does not alter the constitutional status quo. For the purposes of applying the Chambers-Laursen rule it is of no constitutional significance that the police officers here actually conducted a brief roadside search of the automobile. This initial intrusion was conducted in the dark by flashlight; having discovered marijuana during this limited search of the passenger compartment, the officers had reason to believe that additional marijuana might be secreted within the vehicle. Thus, at the time the automobile was searched at the garage there was probable cause to believe it contained *752 contraband. The search, therefore, was permissible under Chambers and Laursen.[21]
In resting our conclusion on the foregoing line of authority we recognize the fact that Lieutenant Ringstad, who initiated and supervised the post-impound search, was in charge of the investigation into the murder of Smith. It is apparent that the principal motivation for the search may have been to discover evidence linking defendants to that murder. Thus, unlike Chambers and Laursen, the objective in conducting the search was most likely unrelated to the offenses for which defendants had been arrested or which resulted in the impounding of the vehicle. This does not, however, render the search constitutionally defective. Whatever their primary motivations the police were authorized to conduct an intensive warrantless search of the entire automobile for evidence related to the marijuana charges. No purpose would be subserved by requiring that when officers are authorized to conduct a warrantless vehicular search for particular evidence they must nevertheless obtain a warrant directing the seizure of evidence which may relate to "other crimes." (See Skelton v. Superior Court (1969) 1 Cal.3d 144, 157-158 [81 Cal. Rptr. 613, 460 P.2d 485].) Accordingly, the seizure of evidence connected to the murder was constitutionally permissible.
Even if it is assumed that there was no probable cause to believe the vehicle contained evidence related to the reasons for which it was impounded, a warrantless search would nevertheless be permissible if after the automobile was impounded the police officers became aware of facts which gave rise to probable cause to search for evidence connected to an "unrelated" offense.[22] The warrantless searches in Chambers, McKinnon and Laursen were deemed constitutionally permissible because of the "distinguishing *753 characteristic of mobility" of the items searched. Once there is probable cause to search such an item, for constitutional purposes there is "no difference between on the one hand ... holding the car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant." (Chambers v. Maroney, supra, 399 U.S. 42, 51-52 [26 L.Ed.2d 419, 428].) This rationale does not turn on whether the probable cause to search arose before or after the automobile is impounded. Rather, it is only necessary that there be probable cause to search at the time the vehicle is searched.[23]

The Search of the Juanita Street Murder Site.
Defendants contend that officers unlawfully entered and searched the Juanita Street residence where the victim had been murdered. The People concede that the entry and search were effected without a warrant. (9) It is axiomatic that probable cause to search does not furnish police officers with a constitutionally sufficient reason to conduct a warrantless search of a dwelling (Vale v. Louisiana (1970) 399 U.S. 30, 34 [26 L.Ed.2d 409, 413, 90 S.Ct. 1969]; Agnello v. United States (1925) 269 U.S. 20, 32-33 [70 L.Ed. 145, 148-149, 46 S.Ct. 4, 51 A.L.R. 409]), and thus the burden rests with the prosecution to demonstrate that the circumstances surrounding the entry and search were so exceptional as to excuse noncompliance with the Fourth Amendment's requirement of prior judicial approval. (Vale v. Louisiana, supra; Badillo v. Superior Court, supra, 46 Cal.2d 269, 272.)
*754 The People contend that the entry and search in the case at bar were permissible under the "hot pursuit" doctrine of Warden v. Hayden (1967) 387 U.S. 294 [18 L.Ed.2d 782, 87 S.Ct. 1642], and People v. Smith (1966) 63 Cal.2d 779 [48 Cal. Rptr. 382, 409 P.2d 222]. In Warden the police pursued a robber into a house and searched the premises for the robber and any weapons which he might have had concealed in the house. The court held that the entry and search were lawful under the following rationale: "The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for the persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape." (Warden v. Hayden, supra, 387 U.S. 294, 298-299 [18 L.Ed.2d 782, 787].) In Smith the police pursued a suspect who had just murdered two policemen. In holding that it was reasonable for the police to enter the suspect's residence in search of him, we noted that there was cause to believe that he may have been inside and that "fresh pursuit of a fleeing suspect who has committed a grave offense and remains dangerous to life and limb may constitute `exceptional circumstances' sufficient to justify a search without a warrant." (People v. Smith, supra, 63 Cal.2d 779, 797.)
It is readily apparent that we are not here confronted with a situation which can be characterized as a "hot pursuit." The entry was effected nearly two hours after the murder was committed, and the police officers were not in actual pursuit of any suspect. They had no idea who or where Smith's murderers were, and there was no particular reason to believe that the murderers were inside the house. In short, Warden and Smith are inapposite and the entry and search of the Juanita Street residence cannot be justified under their authority.[24]
(10) Despite the inapplicability of the "hot pursuit" doctrine, we nevertheless are of the opinion that the circumstances were sufficiently "exigent" so as to justify an immediate entry and search of the premises. A warrantless entry of a dwelling is constitutionally permissible where the officers' conduct is prompted by the motive of preserving life and reasonably appears to be necessary for that purpose. (People v. Roberts (1956) 47 Cal. *755 2d 374, 377-378 [303 P.2d 721]; People v. Superior Court (Peebles) (1970) 6 Cal. App.3d 379 [85 Cal. Rptr. 803]; People v. Gomez (1964) 229 Cal. App.2d 781, 782-783 [40 Cal. Rptr. 616].) And in determining whether an officer acted reasonably we must consider only reasonable inferences which he is entitled to draw from the facts in the light of his experience. (Terry v. Ohio, supra, 392 U.S. 1, 21-22, 27 [20 L.Ed.2d 889, 905-907, 909] [reasonableness of police "stop and frisk"]; People v. Block (1971) 6 Cal.3d 239, 244 [103 Cal. Rptr. 281, 499 P.2d 961] [reasonableness of search for persons in hiding].)
Turning to the case at bar, we note that immediately after the police learned of the shooting on Juanita Street officers were dispatched to investigate. They knew only that a shooting had very recently occurred and that one person suffering from serious wounds had been brought to a hospital. The officers found fresh bloodstains on the fence and porch of the Juanita Street murder site and on an automobile parked outside. They also observed through a porch window what appeared to be bloodstains on the floor inside the house. Although only one casualty had thus far been reported, others may have been injured and may have been abandoned on the premises. There was no response when the officers knocked and announced themselves, and entering the premises was the only practical means of determining whether there was anyone inside in need of assistance. If there was, the delay incidental to obtaining a search warrant could have resulted in the unnecessary loss of life. Under the circumstances it was reasonable for the officers to believe that the shooting may have resulted in other casualties in addition to that reported to the police and that an immediate entry was necessary to render aid to anyone in distress. The People, therefore, have borne their burden of demonstrating the existence of circumstances which justify the warrantless entry of the Juanita Street residence.
The privilege to enter to render aid does not, of course, justify a search of the premises for other purposes. (People v. Roberts, supra, 47 Cal.2d 374, 378.) To the contrary, the warrantless search of a dwelling must be suitably circumscribed to serve the exigency which prompted it. (Guidi v. Superior Court, supra, 10 Cal.3d 1, 11-14; People v. Roberts, supra, 47 Cal.2d 374, 378-379.) However, in the course of conducting a properly limited cursory search, police officers may seize evidence in plain sight. (Guidi v. Superior Court, supra, 10 Cal.3d 1, 14; People v. Block, supra, 6 Cal.3d 239, 243; People v. Roberts, supra, 47 Cal.2d 374, 379.) Furthermore, "mere evidence" of crime is as subject to seizure during such a search as is contraband or stolen property as long as there is sufficient "nexus" between the item to be seized and criminal behavior. The controlling test is *756 that it must be reasonable under the circumstances for the police "to believe that the evidence ... will aid in a particular apprehension or conviction." (Warden v. Hayden, supra, 387 U.S. 294, 307 [18 L.Ed.2d 782, 792]; Guidi v. Superior Court, supra, 10 Cal.3d 1, 11-14.)
In the instant case all of the evidence seized at the Juanita Street residence was in plain sight as the officers walked through the premises.[25] And, under the circumstances all of the items seized were reasonably related to the criminal behavior being investigated by the police.[26] The black purse and its contents which were found spilled on the floor were properly seized as possibly belonging to one of the murderers. It was reasonable to believe that the names, addresses and information contained in the yellow notebook and brown address book found in the room where the murder occurred could provide a clue to the identity of the murderers. The bloodspattered eyeglasses and the shotgun shell were both items which clearly appeared to be connected to the recent shooting. The two plastic bags with eye holes cut into them appeared to be masks which the murderers might have worn. The officers could reasonably believe that the piece of fabric with the pocket lining may have been torn from the murderer's clothing in the course of a struggle or that it was used to bind or gag the victim. A strip of adhesive tape had been discovered outside near the bloodstains, and therefore it was reasonable to believe that the adhesive tape found in the room where the shooting took place was related to the crime, possibly as a means of gagging the victim or others present at the time of the shooting. The plaster and paint fragments surrounding the area where the struggle and shooting had obviously occurred were reasonably seized on the ground that they could provide a direct link to the assailants if matching fragments had lodged in their clothing during the commission of the crime. And the marijuana found at the Juanita Street residence was properly seized as contraband.[27] Thus, the items seized in plain sight at the murder scene were the product of a search which was constitutionally permissible with respect to both its inception and *757 scope. The trial court, therefore, correctly ruled that these articles were admissible.

The Warrantless Entry of the H Street Residence
(11a) Defendants next contend that Officer Hardy's warrantless entry into the H Street residence on December 20 was illegal and therefore "tainted" the subsequent search of the premises on December 21 pursuant to a search warrant. Defendants challenge the legality of the entry on the grounds that (1) the police lacked probable cause to arrest Mrs. Hernandez, and (2) the police failed to comply with the requirements of section 844.
When officers entered the H Street residence they were searching for Mrs. Hernandez to arrest her in connection with the robbery and murder of Smith. The officers knew that on the day of the murder Smith had telephoned Mrs. Hernandez; that Smith had arranged to meet Mrs. Hernandez at the Juanita Street residence to purchase some marijuana; that Mrs. Hernandez had been at the Juanita Street residence at the time of the murder and had admitted Smith and McElhinney into the house; and that Mrs. Hernandez had departed from the automobile immediately before McElhinney and Hernandez reached the hospital with Smith's body. The police also knew that Smith's name and telephone number were listed in Hernandez' personal telephone directory and that Schnabel's telephone directory listed the names of "Tudy" and "Sparky" Hernandez and their H Street address. These facts were more than sufficient to warrant a prudent man in believing that Mrs. Hernandez was a participant in a conspiracy to rob and perhaps murder Smith, or at least that she aided and abetted in the crime. Thus, there was probable cause to arrest Mrs. Hernandez. (People v. Hogan (1969) 71 Cal.2d 888, 890 [80 Cal. Rptr. 28, 457 P.2d 868].)
Section 844 "justifies an entry by police officers into a closed residence in order to make an arrest, if they have reasonable grounds for believing the person to be arrested is inside and if they have demanded admittance and explained the purpose for which admittance is sought." (Horack v. Superior Court (1970) 3 Cal.3d 720, 726 [91 Cal. Rptr. 569, 478 P.2d 1].) On December 18 the landlady had confirmed that Mrs. Hernandez did reside at the H Street residence and Officer Hardy had requested that the landlady contact him if Mrs. Hernandez returned. Information supplied by a citizen who voluntarily comes forward to aid law enforcement officers is presumed to be reliable. (Krauss v. Superior Court (1971) 5 Cal.3d 418, 421-422 [96 Cal. Rptr. 455, 487 P.2d 1023]; People v. Edwards (1969) 71 Cal.2d 1096, 1106 [80 Cal. Rptr. 633, 458 P.2d 713]; *758 People v. Tharp (1969) 272 Cal. App.2d 268, 271-272 [78 Cal. Rptr. 412].) Thus, when the landlady informed Officer Hardy on December 20 that Mrs. Hernandez' car was parked outside the residence and that she was inside, he could reasonably rely on this information. In addition, Hardy himself had observed the automobile and also had noted that a porch light was on. Under these circumstances it was not unreasonable to believe that Mrs. Hernandez was indeed present within the house.[28]
The notice requirements of section 844 provide that before entering to effect an arrest a police officer must identify himself, announce his purpose and demand entry. (People v. Superior Court (Ludeman) (1969) 274 Cal. App.2d 578, 580 [79 Cal. Rptr. 55].) The first and third requirements were satisfied when Officer Hardy loudly identified himself as a police officer and pounded on the door. (People v. Hall (1971) 3 Cal.3d 992, 997 [92 Cal. Rptr. 304, 479 P.2d 664].) (12) Under the doctrine of "substantial compliance" the requirements of section 844 will be deemed satisfied where police officers identify themselves, demand entry and, although they fail to explain why they seek admittance, it is reasonably apparent to the occupants why the police wish to enter. (Greven v. Superior Court (1969) 71 Cal.2d 287, 291-293 [78 Cal. Rptr. 504, 455 P.2d 432]; People v. Cockrell (1965) 63 Cal.2d 659, 665-666 [47 Cal. Rptr. 788, 408 P.2d 116]; People v. Martin (1955) 45 Cal.2d 755, 762-763 [290 P.2d 855].) (11b) If Mrs. Hernandez had been inside, it would have been apparent to her that officers demanding admittance wished to see her in connection with the fatal shooting which had occurred in her presence only three days before. The entry, accordingly, was effected in a manner which substantially complied with the requirements of section 844 and was therefore lawful.
Once inside the residence Officer Hardy properly limited his search to walking through the house to determine whether Mrs. Hernandez was within the house. During a lawful search of a private dwelling for persons believed to be in hiding, evidence falling into plain view is subject to seizure. (Harris v. United States, supra, 390 U.S. 234, 236 [19 L.Ed.2d 1067, 1069-1070]; People v. Block, supra, 6 Cal.3d 239, 243.) Hardy's observation of defendants' names and telephone numbers in Mrs. Hernandez' telephone directory was made without touching or disturbing the directory. This evidence, therefore, was fully disclosed to the eye of an *759 officer who had a right to be where he was and was lawfully obtained. (Dillon v. Superior Court (1972) 7 Cal.3d 305, 310 [102 Cal. Rptr. 161, 497 P.2d 505].)

The Search, with Warrant, of the H Street Residence.
(13a) Defendants claim that the trial court erroneously refused to suppress the evidence seized during the December 21 search of the H Street residence. This claim of error rests on two contentions: (1) that the affidavit, and consequently the search warrant which authorized the search, was defective in that the affidavit was based on hearsay information which fails to satisfy the requirements of Aguilar v. Texas (1964) 378 U.S. 108 [12 L.Ed.2d 723, 84 S.Ct. 1509], and was the poisoned fruit of unlawful police activities; and (2) that even if the search warrant was valid, the scope of the search and seizure conducted impermissibly exceeded the authority granted by the warrant.
(14) When it is determined that a magistrate impermissibly relied on portions of an affidavit in support of a search warrant, the invalidity of the warrant is not necessarily established. Rather, we require only that the sufficiency of the affidavit be tested by considering solely those portions which have withstood constitutional scrutiny. (Theodor v. Superior Court (1972) 8 Cal.3d 77, 100-101, fn. 14 at p. 101 [104 Cal. Rptr. 226, 501 P.2d 234].)
(13b) In the case at bar the search warrant was issued on the basis of an affidavit submitted by Officer Hardy, a summary of which is set out in the margin.[29] The affidavit contains not only statements of the personal *760 observations of the affiant, but also the hearsay statements of several other individuals. We are confronted, therefore, with the threshold question whether the nature of the hearsay information is such that the issuing magistrate could constitutionally rely on it. (15) The controlling test was established in Aguilar v. Texas, supra, 378 U.S. 108, and stated by this court in People v. Hamilton (1969) 71 Cal.2d 176, at pages 179-180 [77 Cal. Rptr. 785, 454 P.2d 681], as follows: "[F]or an affidavit based on an informant's hearsay statement to be legally sufficient to support the issuance of a search warrant, two requirements must be met: (1) the affidavit must allege the informant's statement in language that is factual rather than conclusory and must establish that the informant spoke with personal knowledge of the matters contained in such statement; and (2) the affidavit must contain some underlying factual information from which the magistrate issuing the warrant can reasonably conclude that the informant *761 was credible or his information reliable." (See also Aguilar v. Texas, supra, 378 U.S. 108, 114 [12 L.Ed.2d 723, 728-729].)
(13c) David McElhinney, both as a victim and witness to the crime, is presumptively reliable as a "citizen-informant" even though his reliability has not previously been tested. (People v. Hogan, supra, 71 Cal.2d 888, 890.) His information, moreover, was obviously based on his personal observations. Officers Thurlow, Rogers and Telles, as police officers, are also presumed to be reliable, and their statements could properly be relied upon by the magistrate if the original source of the information otherwise satisfies the Aguilar test. (People v. Hogan, supra, 71 Cal.2d 888, 891; People v. McDowell (1972) 27 Cal. App.3d 864, 880 [104 Cal. Rptr. 181].) The information supplied by Thurlow and Rogers was based on their personal observations and thus satisfies Aguilar. However, Telles' information came from Hernandez, an untested informant, and therefore may not be relied upon to establish probable cause. The information provided by Mrs. Smith, the victim's wife, may be considered because as a citizen-informant and a close relative of the victim her statements are presumptively reliable. Thus, the hearsay statements of Hernandez in paragraph II of the affidavit must be deleted; additionally, the statements of defendants contained in paragraphs VI and X must also be excised because the trial court ruled that they were illegally obtained and the People do not challenge that holding. (See fn. 28, supra.)
We now test the affidavit by considering only those portions on which the issuing magistrate could permissibly rely. There is considerable competent information in the affidavit which links Mrs. Hernandez to the crime and to the defendants, who were then reasonably suspected of being the two assailants who had robbed and shot Smith. The residence, moreover, was clearly established as belonging to Mrs. Hernandez. We conclude, accordingly, that the affidavit sets forth sufficient competent evidence supportive of the magistrate's finding of probable cause.[30]
(16) The challenge to the validity of the December 21 search of the H Street residence requires that we also determine whether the scope of the search was impermissibly broad.
In Skelton v. Superior Court, supra, 1 Cal.3d 144, we addressed ourselves to the question of the permissible scope of a search conducted pursuant *762 to a warrant. We recognized that the "general rule" is that "only the property described in the warrant may be seized." (Id., at p. 155.) In this manner little is left to the discretion of the officer executing the warrant. We then proceeded, however, to articulate a "well-established" distinction under which the challenged seizures in Skelton were held to be lawful: "When officers, in the course of a bona fide effort to execute a valid search warrant, discover articles which, although not included in the warrant, are reasonably identifiable as contraband, they may seize them whether they are initially in plain sight or come into plain sight subsequently, as a result of the officers' efforts." (Id., at p. 157; italics added.) Our use of the term "contraband" in Skelton was not intended to resurrect the irrational distinction between contraband and "mere evidence" which was finally laid to rest in Warden v. Hayden, supra, 387 U.S. 294, 300-308 [18 L.Ed.2d 782, 788-793]. (See Guidi v. Superior Court, supra, 10 Cal.3d 1, 11-14; North v. Superior Court, supra, 8 Cal.3d 301, 307.) On the other hand, neither should we be unmindful that in Warden the United States Supreme Court expressly rejected the proposition that in the course of a lawful search police officers are authorized to indiscriminately seize any items whatsoever. Rather, the court fashioned a rule which accommodates the Fourth Amendment's requirement of specificity and the government's legitimate interest in solving crime: "There must ... be a nexus  automatically provided in the case of fruits, instrumentalities or contraband  between the item to be seized and criminal behavior. Thus, in the case of `mere evidence,' probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction." (Warden v. Hayden, supra, 387 U.S. 294, 307 [18 L.Ed.2d 782, 792].)
The "nexus rule" of Warden, which involved a lawful warrantless search, applies with equal force and effect in the context of a search conducted pursuant to a warrant. In both situations the same fundamental proposition controls  the scope of a search must be circumscribed by the reasons which justified its inception. It is by this rational limitation that the Fourth Amendment protects the individual against unfettered discretion. (Terry v. Ohio, supra, 392 U.S. 1, 29 [20 L.Ed.2d 889, 910-911]; Marron v. United States (1927) 275 U.S. 192, 196 [72 L.Ed. 231, 237, 48 S.Ct. 74].) In short, the "nexus rule" is necessary to achieve what we intended in Skelton  a "realistic balancing of the requirements of effective law enforcement and the necessity to protect the privacy of the citizen from unwarranted governmental intrusion." (People v. Skelton, supra, 1 Cal.3d 144, 158.)
The search warrant obtained by Officer Hardy authorized the seizure of the personal telephone directory of Mrs. Hernandez, all correspondence between *763 Mrs. Hernandez and Gerald Schnabel, Charles Hill and Stephen Smith, and all memoranda concerning possible narcotics dealings with Stephen Smith. The police seized two telephone directories marked "Tudy and Sparky Hernandez," and two notebooks containing notations of narcotics sales. These items were specifically denominated in the warrant and were lawfully seized. A telephone bill which was made out to Amelia Hernandez, the reputed owner of the Juanita Street residence where Smith was murdered, and which contained the telephone number of that house was seizable as tending to establish a link between Annette "Sparky" Hernandez and the murder site. There was also a sufficient "nexus" to justify the seizure of a suitcase, two open plastic bags, and a pair of panty hose with the legs cut off. Marijuana debris was found in the suitcase which resembled the suitcase used by Smith in his marijuana transactions. The possible connection with Smith coupled with the role of marijuana in the case rendered the seizure of the suitcase lawful. The two green plastic bags resembled one found in the defendant's automobile and therefore tended to establish a link between Mrs. Hernandez and the defendants.[31] And, since there was evidence that the murderers had worn masks during the robbery and murder, it was reasonable to seize the cut-off panty hose which is a not uncommon means of forming a mask. Finally, although there was no evidence linking the rifle which was seized to the murder, possession of that particular rifle constituted a misdemeanor because its serial number had been removed. (§ 537e.) It was thus permissible to seize the rifle as contraband which fell into plain view during a lawful search. (People v. Block, supra, 6 Cal.3d 239, 243.)
Other items seized, however, do not satisfy the nexus test. Four tape recordings were seized on the ground that they "might reveal something."[32] Mere speculation such as this is insufficient. The police officers who seize an article must be presently aware of some specific and articulable fact from which a rational link between the item seized and criminal behavior can be inferred. The seizure of two paper bags marked with drug store labels and containing a cash register receipt from the same store was explained on the ground that they might have been evidence of the purchase of the adhesive tape used to tie Hernandez at the murder site. This, too, is pure speculation and will not suffice to establish the requisite nexus. Similarly, it was only *764 speculation which prompted the seizure of a motel receipt in the name of Mrs. Hernandez. Officer Rogers felt there might be information at the motel which would connect Mrs. Hernandez to other participants in the crime. Although it would have been proper for Officer Rogers to follow up this lead, there was no basis for seizing the receipt.
To summarize: the officers properly seized the telephone directories, the notebooks, the telephone bill, the suitcase, the two green plastic bags, the cut-off panty hose and the rifle. The remaining articles  the tape recordings, plain paper bags with the receipt, and the motel receipt  must be suppressed.

The Tape-recorded Jailhouse Conversation.
(17) The defendants contend that the tape-recorded conversation between Schnabel and his wife on December 23 should have been suppressed as the product of an unlawful search and seizure. In North v. Superior Court, supra, 8 Cal.3d 301, a divided court established that the protective ambit of the Fourth Amendment does, under certain limited circumstances, extend to jailhouse conversations between spouses. The majority concluded that the conversation, which "occurred in a detective's office under circumstances which strongly indicate that petitioner and his wife were lulled into believing that [it] would be confidential," was illegally seized and therefore inadmissible. (Id., at pp. 311-312; italics added.) This conclusion was grounded on the principle, drawn from the language of Katz v. United States (1967) 389 U.S. 347, 353 [19 L.Ed.2d 576, 583, 88 S.Ct. 507], that where one harbors a "reasonable expectation of privacy" governmental intrusions into that privacy may only be effected in a manner consistent with the requirements of the Fourth Amendment. (North v. Superior Court, supra, 8 Cal.3d 301, 308-311.) Although the majority noted that "California cases have uniformly held that an inmate of a jail has no right of privacy" (id., at p. 308; see cases cited in Halpin v. Superior Court (1972) 6 Cal.3d 885, 900, fn. 21 [101 Cal. Rptr. 375, 495 P.2d 1295]), such precedent was distinguished on the ground that "[n]one of the prior cases ... involved confidential marital communications." (Id., at p. 309.) The majority rejected the People's contention that no jailhouse conversation could be "made in confidence," and reasoned that where a marital jailhouse conversation occurs under circumstances in which the spouses reasonably expect it to be private, its warrantless electronic seizure is unlawful.
The majority in North expressly recognized that "an ordinary jailhouse conversation between spouses could not be deemed to have been `made in confidence'...." (Id., at p. 311; italics added.) It was the police officers' *765 deliberate attempt to create an expectation of privacy which led the majority in that case to conclude that the expectations of the Norths were reasonable. (Id., at pp. 311-312.) Absent such unusual circumstances, spouses can have no reasonable expectation that their jailhouse conversations will be private.
In the instant case the record discloses no evidence whatsoever that officers created an expectation or belief that the Schnabel conversation would be private. Schnabel and his wife conversed in a common visiting room over an intercom system. None of the views expressed by the majority in North would require the exclusion of the conversation in the instant case. We conclude that the conversation was properly monitored and recorded, and therefore it was properly received in evidence.

The Remaining Suppression Motions.
(18) Defendant's pretrial motion to suppress was an appropriate means of challenging the admissibility of McElhinney's identification of Hill and the "wheeling and dealing" statement made by Schnabel during the course of the pat-down search. (People v. Lawrence (1971) 4 Cal.3d 273, 275, fn. 1 [93 Cal. Rptr. 204, 481 P.2d 212]; Saidi-Tabatabai v. Superior Court (1967) 253 Cal. App.2d 257 [61 Cal. Rptr. 510].) However, such issues may not be raised on this appeal because the defendants failed to seek or obtain the certificate of probable cause required under section 1237.5 and California Rules of Court, rule 31(d).[33] As it does not appear that either of the two exceptions appearing in the second paragraph of rule 31 (d) is applicable, *766 defendants were required to comply with section 1237.5 in order to raise these issues on appeal.[34]
Although the additional issues, for the reasons set forth above, are not properly before this court, it is appropriate in the interest of judicial economy that we comment on the merits of defendants' claims. (19) Defendants' contention that the photographic identification procedure was unduly suggestive rests primarily on the fact that their "mug shots" were dated December 18, the day after the murder, while the other five photographs had much earlier booking dates stamped on them. In People v. Hicks (1971) 4 Cal.3d 757 [94 Cal. Rptr. 393, 484 P.2d 65], we rejected the same contention under circumstances which closely resemble those of the instant case. There, as here, the witness testified that he had not even noticed the dates which appeared at the bottom of the photographs. In addition, in both Hicks and the case at bar, the other photographs were selected because of their similarity to the defendants' photographs, and the witness was merely asked to examine the photographs and determine if any resembled the perpetrator of the crime. As we stated in Hicks, such a procedure is not "`so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification'." (Id., at p. 764, quoting from Simmons v. United States, supra, 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253].)[35] The fact that McElhinney, unlike the witness in Hicks, had only a brief glimpse of his assailant and was unable to provide the police with a detailed description prior to seeing the photographs does not render the photographic procedure impermissibly suggestive. McElhinney unequivocally identified Hill at the preliminary hearing and testified at the suppression hearing that his identification was based solely on his observations of the assailant at the scene of the *767 crime. We are of the view, therefore, that the trial court correctly determined that the photographic procedure was proper and that the identification evidence was admissible.
(20) Defendant Schnabel's contention that his statement "wheeling and dealing" was elicited in violation of Miranda v. Arizona, supra, 384 U.S. 436 is also without merit. Officer Smith's question as to where Schnabel obtained the money was merely an instance of "general on-the-scene investigatory questioning" with respect to which Miranda notice requirements are inapplicable. (People v. Miller (1969) 71 Cal.2d 459, 480-482 [78 Cal. Rptr. 449, 445 P.2d 377]; People v. Superior Court (Mahle) (1969) 3 Cal. App.3d 476, 489 [83 Cal. Rptr. 771]; Lockridge v. Superior Court (1969) 275 Cal. App.2d 612, 620 [80 Cal. Rptr. 223].) At the time Smith asked the question Schnabel was not suspected of any crime. The type of question asked is a permissible means for a police officer who has detained someone to quickly ascertain whether such person should be released or held for further investigation. Thus there was no Miranda violation and Schnabel's statement is admissible.

Disposition.
(21) We have concluded that the trial court correctedly denied defendants' motion under section 1538.5 to suppress with respect to all evidence except the aforementioned particular articles seized during the search of the H Street residence. Thus the bulk of the evidence which defendants sought to suppress would indeed be admissible if they were to be tried. The question now presented is whether, in view of the fact that the trial court erred in failing to suppress some of the evidence, defendants' pleas of guilty must be set aside.[36]
A plea of guilty is the equivalent of a conviction and nothing remains to be done aside from pronouncing judgment and determining punishment. In *768 entering such a plea a criminal defendant waives several of his most fundamental constitutional rights  the privilege against compulsory self-incrimination, the right to trial by jury and the right to confront one's accusers. (Boykin v. Alabama (1969) 395 U.S. 238, 243 [23 L.Ed.2d 274, 279-280, 89 S.Ct. 1709]; In re Tahl (1969) 1 Cal.3d 122, 130-131 [81 Cal. Rptr. 577, 460 P.2d 449].) Further, a plea of guilty may bring in its wake consequences of the greatest magnitude, including the loss of one's liberty and even death. Consequently, only the most compelling reasons can justify any interference, however slight, with an accused's prerogative to personally decide whether to stand trial or to waive his rights by pleading guilty.
When, on an appeal from a judgment of conviction entered on a plea of guilty (§ 1538.5, subd. (m)), an appellate court determines that the trial court erroneously refused to suppress some but not all evidence, the situation is altered, no matter how slightly, from that which existed prior to the plea of guilty. The harmless error concept as a basis for according relief in such a setting is clearly inappropriate. There simply is no intelligent means of assessing the impact of a particular erroneous refusal to suppress evidence. Unlike the ordinary post-trial appeal, there is nothing at all in the record to indicate what evidence or defenses the defendant is capable of producing on his own behalf. The strategic considerations which lead an accused to plead guilty pursuant to a plea bargain will frequently hinge not only on the quantum and quality of the prosecution's evidence, but also on the probable effectiveness of the defenses and evidence which the defendant has to counterbalance the incriminating evidence. After the exclusion of certain items of evidence, the prosecution's case may continue to appear invulnerable to an appellate court which necessarily can look only to the strength of competent evidence indicative of the accused's guilt. However, the defendant may have or believe he has means of impeaching, discrediting or casting doubt on such evidence, and the items excluded on appeal might be the very ones which posed the most difficult strategic problems for the defendant. Only the accused and his counsel are aware of what favorable evidence is available to them. We cannot, with any assurance, conclude that an appellate court, which does not have the benefit of that knowledge, can consistently arrive at an accurate assessment of whether the defendant would again plead guilty after knowledge that some but not all of the challenged evidence is to be suppressed. To the contrary, an unacceptable degree of appellate speculation would necessarily inject itself into the application of the harmless error concept in such a context.[37]
*769 In view of the magnitude of the consequences of a guilty plea and the lack of an adequate basis upon which an appellate court can evaluate the impact of a trial court's error, we conclude that the doctrine of harmless error is inapplicable in the context of an appeal under section 1538.5, subdivision (m). The accused must be afforded an opportunity to personally elect whether, contrary to the trial court's ruling, the suppression of certain items of evidence would alter the situation in a sufficiently favorable manner so as to render a plea of not guilty strategically preferable.[38]
The guilty pleas here were entered pursuant to a plea bargain under the terms of which defendants were permitted to plead guilty to murder in the second degree and the charges of robbery and possession of marijuana against defendants were dismissed. For the reasons set forth above defendants are entitled to have the judgments of conviction vacated and the pleas of guilty set aside. In such event the People may, if they choose, effect a reinstatement of all original charges contained in the information. (Accord, People v. Landry, supra, 276 Cal. App.2d 370, 377; People v. Fry, supra, 271 Cal. App.2d 350, 359.) In this manner all parties would, in effect, be returned to the status they occupied immediately after the trial court erroneously ruled on defendants' suppression motion. In view of the fact that the bulk of the evidence would be admissible if defendants are to be tried, however, they should not be foreclosed from an election to be bound by the judgments and thus not subject themselves to trial on the original charges. (See People v. Coffey (1967) 67 Cal.2d 204, 224-225 [60 Cal. Rptr. 457, 430 P.2d 15].)
The judgments are reversed and the causes remanded to the trial court. That court is directed, upon the motion of either or both defendants within *770 30 days of the finality of this opinion, to vacate the guilty plea or pleas, to reinstate those charges contained in the information as moved for by the People, and proceed to trial or other appropriate disposition in accordance with the views expressed in this opinion. Should defendants or a particular defendant not so move, or should either defendant duly waive his right to so move, the trial court is further directed to reinstate the judgments or judgment as to the particular defendant.
Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.
CLARK, J., Concurring and Dissenting.
I dissent from holding the harmless error doctrine inapplicable to an appeal taken from a guilty plea entered following erroneous denial of a motion to suppress evidence. (Pen. Code, § 1538.5, subd. (m).) However, I concur in reversing the judgments because the record on appeal does not permit an assessment of possible prejudice. The tape recordings having neither been played nor summarized at the suppression hearing, it is impossible to determine whether the trial court's refusal to suppress them contributed to defendants' guilty pleas. But unless the tapes and receipts are highly incriminating, it is clear beyond a reasonable doubt that defendants' pleas were instead based upon consideration of the following three factors.
First, the admissible evidence of guilt is overwhelming. Approximately 15 minutes after victim Smith was murdered, defendants Hill and Schnabel were arrested 12 miles from the scene following a desperate attempt to escape apprehension. Hill falsely identified himself. Schnabel had ammunition in his pocket. Victim McElhinney's wallet and identification  taken by the murderers  were found on the chase route, together with two pistols. Victim Smith's wallet also had been taken; earlier he had told McElhinney he had $1,700. The $1,800 Schnabel possessed when arrested he claimed to have acquired by "[w]heeling and dealing." The murder occurred in the residence of Amelia Hernandez; her personal telephone directory listed Schnabel. "Sparky" and "Tudy" Hernandez were involved in the crime; their names were listed in Schnabel's personal telephone directory. The fence, porch and floor of the murder scene were bloodstained; so were Schnabel's hands. Victim McElhinney positively identified Hill.
Second, if defendants had taken the stand to deny the charges, they could have been impeached through full confessions otherwise inadmissible as having been obtained in violation of Miranda v. Arizona (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. (See Harris *771 v. New York (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643]; People v. Nudd (1974) 12 Cal.3d 204 [115 Cal. Rptr. 372, 524 P.2d 844].)
Third, defendants were permitted to plead guilty to second degree murder in the face of an earlier jury verdict convicting their codefendant of first degree murder.
Under these circumstances, it is simply inconceivable that defendants would have pleaded not guilty but for the trial court's error  unless the evidence erroneously held admissible was extremely incriminating. The tape recordings might be extremely incriminating, but they might also be "Nelson Eddy's Greatest Hits." Were they the latter, and were the receipts equally innocuous, I would have no difficulty applying the harmless error doctrine and affirming the judgments of conviction.
McComb, J., concurred.
NOTES
[1] All statutory references are to sections of the Penal Code except where otherwise specified.

In addition to murder defendants Charles Edwin Hill, Jr. and Gerald Meyer Schnabel, together with a codefendant Arthur "Tudy" Hernandez, were charged with robbery. (§ 211.) Hill and Schnabel were also charged with possession of marijuana. (Health & Saf. Code, § 11530 [now § 11357].) Hernandez' motion for a separate trial was granted. (§ 1098.) Defendants Hill and Schnabel (hereinafter "defendants") initially entered pleas of not guilty to all charges. Following the denial of several pretrial motions defendants entered into a plea bargain (§ 1192.5) pursuant to which they withdrew their pleas of not guilty, entered pleas of guilty to murder which was stipulated to be of the second degree (§ 1192.1), and the charges of robbery and possession of marijuana were dismissed. Both defendants were denied probation (§ 1203) and were sentenced to state prison for the term prescribed by law (§ 190).
[2] Defendants also unsuccessfully moved for separate trials (§ 1098) and to set aside the information (§ 995). A petition for a writ of prohibition (§ 999a) following the denial of the section 995 motion was denied (Hill v. Superior Court, 4 Civ. 11528) as were petitions for writs of mandate (Code Civ. Proc., § 1086) to compel suppression of evidence after denial of the motions to suppress. (Hill v. Superior Court, 4 Civ. 11579; Schnabel v. Superior Court, 4 Civ. 11580.)

The trial court granted defendants' motions to suppress statements made to each other and to police officers while in custody as violative of defendants' rights under Miranda v. Arizona (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R. 3d 974]. Since the People do not challenge this ruling its propriety is not before us on this appeal. (§ 1252.)
Section 1538.5, subdivision (m), expressly permits a defendant, whose motion to suppress evidence has been denied, to plead guilty and then appeal, asserting the alleged unlawful seizure of evidence. (People v. West (1970) 3 Cal.3d 595, 600 [91 Cal. Rptr. 385, 477 P.2d 409].) The fact that, as in the instant case, a plea of guilty is entered pursuant to a plea bargain does not affect the right to bring an appeal under section 1538.5, subdivision (m). Furthermore, a defendant bringing an appeal under subdivision (m) need not preliminarily seek and obtain a certificate of probable cause under Penal Code section 1237.5. (Id., p. 600; Moran v. St. John (1968) 267 Cal. App.2d 474, 477-478 [73 Cal. Rptr. 190]; Cal. Rules of Court, rule 31(d).)
[3] The record does not disclose what, if any, relationship existed between Amelia Hernandez and Annette "Sparky" Hernandez or Arthur "Tudy" Hernandez.
[4] Arthur Hernandez was separately tried and convicted of first degree murder on June 23, 1971. His wife, Annette "Sparky" Hernandez, was also separately charged and convicted of first degree murder.
[5] The number on the vehicle identification plate on the left front door corresponded with the number on the registration certificate, discovered later during the course of a search of the vehicle.
[6] Later tests proved that the cigarettes did indeed contain marijuana.
[7] McElhinney and Hernandez had informed the police as to the circumstances surrounding the shooting.
[8] The evidence seized included a black purse and its contents, which were discovered spilled on the floor, a yellow notebook, a brown address book, bloodstained eyeglasses, two strips of white adhesive tape, a roll of adhesive tape, two green plastic bags with a pair of holes cut in them, a shotgun shell, paint and plaster fragments found on the livingroom floor, a piece of plaid fabric with a pocket lining, and a plastic bag containing marijuana.
[9] Many small items were seized during this search of the automobile, including the cover of a container of a small roll of adhesive tape and a green plastic bag.
[10] In addition, the police had information that on the afternoon of the day on which he was killed, Smith had placed a telephone call to the same residence.
[11] Smith testified that it was his experience that passengers rarely alight from an automobile when it is halted by an officer, and that his suspicions were immediately aroused when Schnabel stepped out of the automobile. Although we agree, for reasons set forth below, that the pat-down was lawfully initiated, we do not hold that without any accompanying suspicious gesture or movement a passenger's alighting from a detained automobile is a circumstance which may permissibly be relied on in justifying a pat-down search of the passenger. There is no rational relationship between such an action, standing alone, and the conclusion that the passenger is armed or dangerous, and only "reasonable inferences" of danger are to be given weight in determining the constitutionality of a pat-down search. (Terry v. Ohio, supra, 392 U.S. 1, 27 [20 L.Ed.2d 889, 909]; People v. Collins, supra, 1 Cal.3d 658, 661-662; People v. Superior Court (Kiefer) (1970) 3 Cal.3d 807, 827-828 [91 Cal. Rptr. 729, 478 P.2d 449].)
[12] As he proceeded towards the scene of the chase Smith listened to Quaschnick's radio reports of the progress of the chase. In addition to the reports of the high speeds and many evasive turns, Smith knew that at one point the fleeing automobile had dangerously "spun out" of control and then accelerated back in the opposite direction from which it had come.
[13] Officer Smith was also aware that the area in which the defendants were apprehended was one where there had been a high incidence of crime, including several recent armed robberies. Although Smith's pat-down of Schnabel would have been permissible even in the absence of this knowledge, it nevertheless is another factor which supports the conclusion that Smith's precautionary frisk of Schnabel was reasonable. (See People v. Siegenthaler (1972) 7 Cal.3d 465, 469 [103 Cal. Rptr. 243, 499 P.2d 499]; People v. Williams (1968) 263 Cal. App.2d 756, 759 [69 Cal. Rptr. 925].) Further, as far as the reasonableness of a pat-down is concerned, there is no basis for differentiating between a passenger and a driver. It is reasonable for an investigating officer to take precautionary measures with respect to all occupants of a fleeing automobile. (See People v. Martin, supra, 46 Cal.2d 106; People v. Mickelson, supra, 59 Cal.2d 448.)
[14] We are aware that in Mosher we stated by way of dictum that a box of matches does "not ordinarily feel like [a weapon]." (1 Cal.3d at p. 394; italics added.) The matchbox in the instant case was relatively large  three inches by three inches  and Smith could reasonably have believed it to be an object or a container of an object usable as an instrument of assault.
[15] Amacher v. Superior Court (1969) 1 Cal. App.3d 150 [81 Cal. Rptr. 558], in which the court held that although a police officer was justified in removing a hard "flip-top" cigarette box from the defendant's pocket, he was not permitted to examine its contents, is distinguishable. There the cigarette box appeared normal in every respect and the police officer testified that he opened it because he believed it might contain marijuana and not because he suspected that the box or its contents might be usable as a weapon of assault.
[16] Although it was determined after the search that the package on the rear seat did not actually contain marijuana, probable cause is determined by the facts known and observations made at the time of an arrest or search. (People v. Talley (1967) 65 Cal.2d 830, 835 [56 Cal. Rptr. 492, 423 P.2d 564]; People v. Privett (1961) 55 Cal.2d 698, 701 [12 Cal. Rptr. 874, 361 P.2d 602].)
[17] Officer Quaschnick was entitled in any event to look into the automobile to ascertain whether there were other occupants. If his reasonable fear for his safety was sufficient to justify the indignity of a pat-down search then, a fortiori, a limited precautionary investigation of the automobile to assure that there were no potential assailants hiding within was permissible. (See People v. Flores (1972) 23 Cal. App.3d 23, 28 [99 Cal. Rptr. 858]; People v. Wigginton (1967) 254 Cal. App.2d 321, 326 [62 Cal. Rptr. 104].)
[18] Since we conclude that the search was constitutionally permissible under the Carroll doctrine, it is unnecessary to decide whether the search was justified on the ground that there was probable cause to believe the vehicle was stolen (see People v. Teale (1969) 70 Cal.2d 497, 507-513 [75 Cal. Rptr. 172, 450 P.2d 564]; North v. Superior Court (1972) 8 Cal.3d 301, 305-308 [104 Cal. Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155]), or on the ground that it was a search incident to Schnabel's arrest for armed robbery.
[19] At the time Officer Thurlow arrested defendants, the automobile's registration card had not yet been found. Under the facts known to Thurlow  the driver had no license, no registration and no certificate of ownership; the vehicle identification plate appeared to have been tampered with; and the defendants had desperately attempted to flee from a routine traffic stop  there was probable cause to arrest the driver, Hill, for auto theft. (See People v. Superior Court (Simon), supra, 7 Cal.3d 186, 196-198.) We leave for another day the question whether a passenger can validly be arrested for auto theft under these circumstances. (See People v. Williams (1970) 9 Cal. App.3d 565, 568-569 [88 Cal. Rptr. 349].) In any event, when the registration was found a short while later and a radio check disclosed no report of the vehicle being stolen, there was no longer probable cause to hold the defendants on the auto theft charge. Their arrest and continued detention, however, did not thereby become illegal; they were being validly held on the marijuana charge.

Defendants also contend that Schnabel's arrest for armed robbery was invalid. We need not reach this issue because under the circumstances the police officers were warranted in detaining Schnabel until the on-the-scene investigation had been completed. (See People v. Shoemaker (1971) 16 Cal. App.3d 316, 320 [93 Cal. Rptr. 921].) Officer Thurlow's search of the automobile, moreover, was justifiable on the basis of information wholly independent of Schnabel's arrest for armed robbery. At the conclusion of that search Thurlow properly arrested Schnabel for possession of marijuana. Thus, even assuming, arguendo, that the armed robbery arrest was not based on probable cause, Schnabel was nevertheless properly detained, and the possible illegality of the robbery arrest did not taint the lawfully conducted automobile search. The fruits of that search, therefore, are admissible. (Wong Sun v. United States (1963) 371 U.S. 471, 488 [9 L.Ed.2d 441, 455-456, 83 S.Ct. 407].)
[20] Section 849 provides, "When an arrest is made without a warrant by a peace officer ... the person arrested ... shall, without unnecessary delay, be taken before the nearest ... magistrate...."

Vehicle Code section 22651 provides, "Any member of the California Highway Patrol or any ... deputy of the sheriff's office ... may remove a vehicle from a highway ...: (h) When an officer arrests any person driving or in control of a vehicle for an alleged offense and the officer is by this code or other law required or permitted to take and does take the person arrested before a magistrate without unnecessary delay."
Vehicle Code section 22850 provides that, "Whenever an officer... removes a vehicle from a highway ... unless otherwise provided, he shall take the vehicle to the nearest garage ... where the vehicle shall be placed in storage."
[21] In United States v. Edwards (1974) 415 U.S. 800 [39 L.Ed.2d 771, 94 S.Ct. 1234] the Supreme Court held that the warrantless search of an arrested suspect's clothing 10 hours after taking him into custody was a permissible search incident to the suspect's arrest. It was undisputed that the police were entitled to conduct a warrantless search of the clothing immediately upon arresting the suspect and the court reasoned that the intrusion upon the suspect's constitutionally protected privacy was no greater if the search was delayed for a reasonable period of time. Similarly, the intrusion attendant upon the warrantless post-impound search in the case at bar is no greater than if the police had conducted the search immediately upon stopping the vehicle on the highway.
[22] The police officers who apprehended the defendants observed bloodstains on Schnabel's hands; a large amount of money, possibly that which had been taken from the victim, was found on Schnabel; the defendants had desperately tried to avoid apprehension; and McElhinney's wallet and identification, along with two handguns, had been found along the chase route. These facts were more than sufficient to establish probable cause to search the vehicle for evidence of the murder.
[23] Defendants' reliance on Preston v. United States, supra, 376 U.S. 364, and Dyke v. Taylor Implement Co., supra, 391 U.S. 216, is misplaced. In Preston the defendants were arrested in their car on a charge of vagrancy, and a warrantless search of the vehicle at a later time was held to be constitutionally impermissible. Preston, however, merely stands for the proposition that such a warrantless automobile search cannot be justified on the theory that it is incident to the arrest of the occupants. (Preston v. United States, supra, 376 U.S. 364, 368 [11 L.Ed.2d 777, 781]; Coolidge v. New Hampshire, supra, 403 U.S. 443, 457 [29 L.Ed.2d 564, 577-578].) Further, in Chambers the court expressly distinguished Preston on the ground that since the arrest was for vagrancy "it was apparent that the officers had no cause to believe that evidence of crime was concealed in the auto." (Chambers v. Maroney, supra, 399 U.S. 42, 47 [26 L.Ed.2d 419, 426].) Similarly, in Dyke, where the defendants had been arrested for reckless driving and their car had been searched later at a police station, the court held that the Carroll doctrine was inapplicable because the police officers lacked "`reasonable or probable cause' to believe that they [would] find the instrumentalities of a crime or evidence pertaining to a crime...." (Dyke v. Taylor Implement Co., supra, 391 U.S. 216, 221 [20 L.Ed.2d 538, 543].) Thus, in both Preston and Dyke the police officers lacked that ingredient essential to a constitutionally permissible search  probable cause. Since in the case at bar there clearly was probable cause to search defendants' automobile, Preston and Dyke are inapposite, and the post-impound search suffers from no constitutional infirmity.
[24] Relying on North v. Superior Court (1972) 8 Cal.3d 301 [104 Cal. Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155], and People v. Teale (1969) 70 Cal.2d 497 [75 Cal. Rptr. 172, 450 P.2d 564], the People also contend that the entire house was evidence and therefore seizable because it was in plain sight. This contention is without merit. Unlike the automobiles seized in North and Teale, the house in the instant case was not itself an instrumentality used to commit the crime, nor was it evidence of the crime.
[25] The officers remained at the house approximately 45 minutes while they collected the evidence which defendants seek to suppress. Although there is some indication in the record that the officers' search exceeded that which was necessary to ascertain whether there was anyone in distress in the house, all of the items which defendants object to were in plain sight in the living room where the murder occurred and in the kitchen. Thus the seizures were not the product of any constitutionally impermissible search conducted while the officers were on the premises.
[26] The items which were seized are listed in footnote 8, infra.
[27] The marijuana was in a plastic bag and apparently visible without opening the bag.
[28] The fact that the automobile did not in fact belong to Mrs. Hernandez is immaterial because Officer Hardy could reasonably rely on the landlady's statement. Further, although the house lights were off and no one responded to Hardy's knocking, it was reasonable to believe that Mrs. Hernandez was attempting to avoid apprehension by turning off the lights and remaining silent. (People v. Carswell (1959) 51 Cal.2d 602, 607 [335 P.2d 99].)
[29] The factual part of the affidavit contains 10 paragraphs.

Paragraph I recites that Hardy was told by Officer Rogers that Smith was brought to the hospital by McElhinney and Mr. and Mrs. Hernandez, that Smith was dead on arrival and that death was caused by a gunshot wound.
Paragraph II recites that "Affiant was informed by Ronald Telles, Detective, Sheriff's Office, that he had spoken with Arthur Hernandez at the Sheriff's Office and learned the following information: That Arthur Hernandez and Annette Hernandez, also known as Sparky, were at [the] Juanita Street [residence] ... during the day of December 17, 1970. That he had called Stephen Smith at his home concerning $300.00 owed by Smith to Hernandez and was waiting for Smith to arrive at his residence. That two men arrived, names unknown. The two men tied up Arthur Hernandez with tape and placed him on the bed and had Annette Hernandez sit on the couch, prior to Smith's arrival. Stephen Smith and David McElhinney came to the residence and were admitted to the house by Annette Hernandez around six o'clock in the evening. He heard a struggle and a shot. Detective Rogers removed a personal telephone director [sic] from the property of Arthur Hernandez, and it contained on the inside cover, `To the only one I shall ever truly love, God Bless, Love, Spark, 7-16-70.' It also had the number of Steve Smith, Muscoy 887-3336."
Paragraph III recites the facts of McElhinney's and Smith's arrival at the Juanita Street residence and Smith's murder, as recounted to Rogers by McElhinney.
Paragraph IV states that McElhinney and the Hernandezes took Smith to the hospital, that Sparky left the car, and that Hernandez told McElhinney to say nothing about her or about narcotics deals.
Paragraph V indicates that the wife of the victim received a telephone call from Mrs. Hernandez inquiring about the death of her husband.
Paragraph VI contains information concerning (a) Officer Hardy's first visit to the H Street residence on December 18 and his request to the landlady to call if Mrs. Hernandez should come home; (b) the jailhouse conversation between the defendants which the trial court subsequently ordered suppressed; and (c) a telephone call between defendants and a female which was overheard by Officer Rogers; the defendants told the female to hold on while they "rode" a "murder beef"; the telephone number called was the same one listed for "Schnabel" in the telephone directory observed at the H Street residence of Mrs. Hernandez.
Paragraph VII recites the facts of Officer Hardy's entry of the H Street residence on December 20 and his observation of the telephone directory with the listing for Schnabel.
Paragraph VIII recites in part that "Affiant observed in the property of Gerald Schnabel, the name Annette Lerma Hernandez (Tudy and Sparky) 457 H Street and 12th, X-XXX-XXX-XXXX off Mount Vernon and Valley. This was observed on December 18...."
Paragraph IX recites that "Affiant learned from Deputy Thurlow that he assisted in the arrest of Gerald Schnabel and Charles Hill. Subjects were arrested by Highway Patrol Officers for H & S 11530, and Vehicle Code violation 4463. Deputy Thurlow observed blood on the hand of Gerald Schnabel and recovered $1800.00 from the person of Gerald Schnabel."
Paragraph X recites certain admissions of defendants which were ordered suppressed by the trial court.
There was additional sworn testimony from Officer Hardy which does not appear in the record. This testimony may not be considered for probable cause since it was not recorded and transcribed as required by section 1526, subdivision(b).
[30] We have already concluded that Officer Hardy's warrantless entry of the H Street residence on December 20 and the arrest of Schnabel for possession of marijuana were lawful. This disposes of defendants' further contentions that the affidavit was in part the tainted fruit of these allegedly illegal police activities.
[31] These bags also resembled the bags observed by Lieutenant Ringstad during his lawful entry and search of the Juanita Street residence on December 17.
[32] The record is totally silent as to the contents of the tape recordings. Officer Rogers testified that he had not listened to the tapes and that there was no police department report on their contents.
[33] Section 1237.5 provides, "No appeal shall be taken by defendant from a judgment of conviction upon a plea of guilty or nolo contendere, except where: (a) The defendant has filed with the trial court a written statement, executed under oath or penalty of perjury showing reasonable constitutional, jurisdictional, or other grounds going to the legality of the proceedings; and (b) The trial court has executed and filed a certificate of probable cause for such appeal with the county clerk."

Rule 31(d) reads as follows: "In cases in which a judgment of conviction was entered upon a plea of guilty or nolo contendere, the defendant shall file the statement required by Section 1237.5 of the Penal Code, which shall serve as a notice of appeal, within 60 days after the rendition of judgment, but the appeal shall not be operative unless the trial court executes and files the certificate of probable cause required by that section.... ¶ If the appeal from a judgment of conviction entered upon a plea of guilty or nolo contendere is based solely upon grounds (1) occurring after entry of such plea which do not challenge the validity of the plea or (2) involving a search and seizure, the validity of which was contested pursuant to section 1538.5 of the Penal Code, the provisions of section 1237.5 of the Penal Code requiring a statement by the defendant and a certificate of probable cause by the trial court are inapplicable, but the appeal shall not be operative unless the notice of appeal states that it is based on such grounds."
Defendants filed their notice of appeal on January 3, 1972. The foregoing language of rule 31(d) became effective on January 1, 1972.
[34] In People v. Clark (1969) 2 Cal. App.3d 510 [82 Cal. Rptr. 682], which was an appeal from a judgment of conviction entered on a plea of guilty, the defendant failed to obtain a certificate of probable cause and yet the court reviewed the trial court's denial of a motion to suppress a confession obtained in violation of Miranda v. Arizona, supra, 384 U.S. 436. The question whether the defendant was entitled to raise the Miranda issue on such an appeal was not presented to nor discussed by the court. (See General Motors Accept. Corp. v. Kyle (1960) 54 Cal.2d 101, 114 [4 Cal. Rptr. 496, 351 P.2d 768] [cases are not authority for propositions not discussed or presented].) To the extent that Clark is inconsistent with the conclusions reached in this opinion it is disapproved.
[35] The record is unclear, but there is some evidence that Hill's photograph may have been the only one in the group which portrayed a bearded man. McElhinney had told the police that his assailant either wore a mask or had a beard. Even if we assume, arguendo, that Hill's photograph was the only one with a beard, it is highly improbable that this affected McElhinney's selection of Hill as the assailant. McElhinney testified that the only features which he paid any attention to while looking through the mug shots were the eyes, cheeks, nose and hairline because these were the only features of the assailant which he had clearly seen.
[36] There is no basis whatsoever for concluding that the items which we hold to be inadmissible are in fact unconnected to the murder or would be irrelevant to the prosecution's case against defendants. Indeed, the opposite conclusion seems unavoidable. In his opening remarks at the suppression hearing, the deputy district attorney stated that at defendants' trial he intended to introduce the physical evidence that was obtained at the H Street residence. This includes, inter alia, the tape recordings, the drugstore receipt and the motel receipt. The district attorney even stated that he intended to call a witness from the drugstore that the police were led to by the drugstore receipt. Furthermore, both at the suppression hearing and on appeal the People have vigorously maintained that the seizure of all items at the H Street residence was lawful. In light of the announced intention to offer these items into evidence at defendants' trial and the People's firm position that they were legally seized, the inference seems inescapable that such items, including those we hold to be inadmissible, tend to incriminate defendants and therefore are "connected" to the murder. To conclude otherwise is to engage in unfounded speculation at the expense of defendants.
[37] Only two reported California cases have reached the issue of whether the harmless error doctrine is applicable in an appeal under section 1538.5, subdivision (m) after a plea of guilty where only a portion of the evidence is held inadmissible. (People v. Landry (1969) 276 Cal. App.2d 370, 376-377 [80 Cal. Rptr. 880]; People v. Fry (1969) 271 Cal. App.2d 350, 358-359 [76 Cal. Rptr. 718].) Both courts held that the doctrine was inapplicable, and that a judgment of conviction must be reversed in such a situation.
[38] Parenthetically we note that to hold otherwise might frustrate the legislative purpose behind section 1538.5, subdivision (m). By establishing in subdivision (m) an exception to the long-standing rule limiting review of convictions based on guilty pleas (see § 1237.5; People v. Ward (1967) 66 Cal.2d 571, 575 [58 Cal. Rptr. 313, 426 P.2d 881]), the Legislature presumably hoped to avoid the inconvenience and expense of a trial where the only substantial contested issue is the lawfulness of a search and seizure. If we were to conclude that the harmless error doctrine was applicable in the context of an appeal under section 1538.5, subdivision (m), a defendant who challenges the admissibility of multiple items of evidence might be less inclined to plead guilty so as to obtain a speedy appellate review of an adverse ruling on his suppression motion. By assuring such a defendant that he will be entitled to enter a new plea if some, but not all, of the challenged evidence is deemed inadmissible on appeal, today's decision operates to further the Legislature's intention of encouraging a guilty plea by a defendant whose defense rests on the asserted illegality of a search and seizure.